# Richmond.

## THE NATIONAL VALLEY BANK·OF STAUNTON v. UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION, AND F. S. CROSBY, COMMITTEE OF JOHN A. ALEXANDER.

### November 14, 1929.

486

The opinion states the case.

*Wm. A. Pratt* and *J. M. Perry*, for the appellant.

*Curry & Carter*, for the appellees.

PRENTIS, C. J., delivered the opinion of the court.

This is an appeal from a decree dismissing the petition of The National Valley Bank of Staunton against the United States Fidelity and Guaranty Company, surety upon the official bond of John A. Alexander, special commissioner in the cause of *Cook* v. *Byers*, the object of the petition being to recover of the surety $3,000.00 shown to have been advanced by the bank to Alexander.

The original suit of *Cook* v. *Byers* was for the parti-

tion of a tract of land among the six heirs at law of David H. Landes, deceased. Alexander, then an attorney at law in good standing, since a convicted embezzler and now serving a sentence in the State penitentiary, was counsel for the complainants. There was no counsel for the defendants from the institution of the suit in March, 1918, until late in 1925. In March, 1918, Alexander and George C. Fifer were appointed special commissioners to sell the real estate and were required to execute a bond in the penalty of $5,000.00, with corporate surety. Alexander executed the required bond, with the Guaranty Company as his surety. W. S. Hussey became the purchaser of the land at public auction April 4, 1918, paying $1,687.50 in cash and executing his three bonds for $1,687.50 each, falling due in one, two and three consecutive years, with W. H. H. Sheets as his surety thereon. This sale was confirmed by decree entered April 22, 1918. By that decree Alexander, as commissioner, was charged with the collection of the three purchase money bonds, and was specifically authorized to "assign said bonds at their face value at interest," the reason expressed in the decree for this unusual provision being that the distributees were anxious to receive their money promptly. Alexander having already collected the cash payment, thereafter, in June, 1918, hypothecated the two of these bonds which matured, one April 4, 1920, and the other April 4, 1921, to the bank as collateral security for his personal note for $3,000.00. The proceeds thereof, $2,940.00, was placed by the bank to his credit as attorney June 8, 1918, and it was known to the bank that he habitually drew checks upon the same account for his personal obligations. The balance to his credit, after this deposit on

June 8, was $3,868.78. It is shown that within two days thereafter Alexander paid out to three of the distributees $706.80.

We observe in passing that he at that time had collected the cash payment of $1,687.50, and that exclusive of the proceeds from the discount of his note for the payment of which he pledged the second and third bonds, his credit balance in the bank was more than sufficient to make these payments to these distributees.

Thereafter, from June, 1918, to October 22, 1919, he paid to all the distributees sums aggregating about $3,012.34. It is also observed in passing that in the meantime he had also collected the first of the purchase money bonds and interest, $1,788.75, and $101.25, interest on the second bond which had been pledged to the bank. Just what disposition he made of these collections does not appear from the record, but in the interval, from time to time, he had deposited large sums in the bank to the credit of the same account, and drawn numerous checks thereon to his own order, and to pay his grocery bills, taxes, stenographer's salary, farm and orchard expenses. During the nine months, June, 1918, to March, 1919, his credit balances on this account in the bank greatly varied from time to time. By July, 1918, it had been reduced to $581.28 and in November to $271.43, while in March, 1919, it was $88.75.

Hussey, the purchaser, failed to pay the second and third bonds so held by the bank, though in the meantime he had paid Alexander $600.00 interest thereon, and on March 25, 1922, a rule was issued against him. On June 12, 1922, a decree was entered directing Special Commissioner Alexander to resell the land. No sale, however, was made for two years thereafter. On June 14, 1924, the commissioner was authorized to

make a private sale, subject to confirmation by the court. He thereupon sold the land privately for $4,000.00. This second sale was confirmed June 16, 1924, and Alexander, special commissioner, collected from the second purchaser, Byers, the full amount of the purchase money $4,012.00, and this was sufficient to discharge the balance due by Hussey, the purchaser at the first sale. When this second sale was confirmed, a decree was entered requiring a master commissioner to state the proper distribution of the funds collected by the bonded commissioner, Alexander, and to settle his account. This account was taken and resulted in a finding that Alexander was then in default about $500.00. Exceptions were filed by Alexander to this report, which were overruled, and on September 2, 1925, there was a decree against the special commissioner for the amount of his default.

There having been no appeal from any of these decrees, these proceedings would, of course, be held, under the general rule, to conclude the case.

Much is now made of the fact that the bank was not then a party to the suit, and therefore not bound by these proceedings. It was not until April 16, 1927, that the bank asked leave to file its petition in this case. That petition recites the proceedings in the original cause; shows that Alexander has become totally insolvent; has been convicted of felony, and claims that the surety company is liable to it, notwithstanding the circumstances which we have stated because of the fact that it still held these two bonds of Hussey, so pledged to it nearly nine years before by Alexander, as collateral security for his personal note, and that it should be subrogated to the original rights of the distributees of the fund for the amount which it had advanced to Alexander.

The trial court dismissed the petition, and this appeal is from that decree.

Treating the questions raised in the same order as they are presented in the brief for the appellant, we come first to the contention.—

█ 1. That the transaction between Alexander, bonded commissioner, and the National Valley Bank, in which the bonded commissioner assigned the second and third Hussey purchase money bonds to the bank for the purposes of the case, was valid, and the bonded commissioner and his surety are liable for the $3,000.00 advanced by the bank.

This claim, so earnestly argued by the learned counsel for the appellant, appears to us to be so obviously unsound as to require no discussion. The special commissioner only had the authority of the court to assign the bonds, as we construe the decree, at not less than principal and interest, for the specific purpose of raising funds to pay off the distributees promptly. Instead of doing so, he pledged them as collateral security for his personal note for less than the face value of the bonds, principal and interest, and used most if not all of the fund thus obtained from the bank to pay his own debts. That this pledge of the bonds was a plain violation of his duty and done without authority seems to us to be perfectly apparent. Had the matter been called to the attention of the trial court at any time before the resale, the bank would have been required to surrender the bonds, for it had no right to their possession and no legal interest in them. The commissioner grossly exceeded his authority. The bank had notice of his limited authority, that these bonds were in the custody of the court, and that Alexander had no personal interest in them. His attempted assignment of them as

collateral security for his own note was void. It would have been void had he been a private agent.

"Mere authority to sell does not justify a pledge, even on the principal's account, and *a fortiori* (not) on the agent's account." 1 Mechem on Agency (2d ed.), section 897, 898; *Green* v. *Claiborne*, 83 Va. 391, 5 S. E. 376; *Wheeler Co.* v. *Hite*, 119 Va. 346, 89 S. E. 101; Harrison on Wills and Administration, Vol. 1, section 285, page 574.

2. It is also urged, however, that conceding that the bonded commissioner's assignment of the two Hussey bonds was void, because it was not within the authority "to assign at interest" conferred by the decree of April 22, 1918, nevertheless the fund received, $3,000.00, from the bank, having been by the bonded commissioner paid out to distributees in the cause, therefore, under the circumstances, the bank should be subrogated to the rights of the distributees paid, as it is claimed, with this money, and hence that neither Alexander nor his surety should be permitted to profit at the bank's cost.

The doctrine of subrogation is a favorite with courts of equity. This court has frequently enforced and perhaps extended it. *Morgan* v. *Gollehon, ante*, page 246, 149 S. E. 485 (decided September 19, 1929). Had the bank promprtly appeared in the case of *Cook* v. *Byers*, and shown the state of facts upon which it now relies, and no other rights had then supervened, this would have presented a persuasive, perhaps a convincing, claim for the application of this doctrine. It is said by way of explanation of its failure to appear that it was not a party to the suit and had no notice of the proceedings. It cannot be allowed, however, that one who becomes the holder of or claimant under

bonds given by a purchaser at a judicial sale can ignore the proceedings in the suit out of which all of his rights grow, and then, after decrees establishing rights adverse to his claim, plead ignorance of the proceedings. That a lawful holder of such bonds has an interest in the subsequent proceedings in the cause, as the holder thereof, is certainly true, and having an interest should appear, if necessary to protect that interest, and must, in the absence of fraud, be held to be bound by the subsequent proceedings as though a formal party to the suit.

The doctrine of subrogation being an equitable doctrine, he who invokes it must show that he has the better equity. One of the most familiar rules is that where one of two innocent parties must suffer because of the fraudulent conduct of a third party, that one of the innocent parties who, because of his own negligence, or failure to do what a prudent man should have done under the circumstances, has made the fraud possible, must suffer the consequent loss.

It is unnecessary in this case for us to determine whether or not, under other circumstances, and had the bank asserted its claim promptly, it might be entitled to invoke the doctrine of subrogation, and this for the reason which we have already indicated.

3. The bank was guilty of such gross laches that it would be inequitable to apply the doctrine of subrogation under the circumstances of this case. It appears that Alexander, in 1918, at the time he pledged these bonds and for some time thereafter, was reputed by many to be a man of wealth, and had extensive credit in the community. The bank, instead of advising the court of its holding of these bonds, permitted Alexander to renew his note for $3,000.00 and pledge

Hussey's bonds therefor twenty-four times, and no one except Alexander and the bank's officials had any knowledge or intimation of the transaction for nearly nine years after its inception. In the meantime the bonds had been long past due, there had been this resale of the land, collection of the entire purchase money from the second purchaser, its distribution, and a settlement of the special commissioner's account in the case, after all of which the bank appeared and claimed to have this substantial interest in the litigation. During this period the financial condition of Alexander had so changed that the relief and protection which his surety might have invoked is now unavailable because of the insolvency of Alexander.

The Supreme Court of the United States, in *O'Brien* v. *Wheelock*, 184 U. S. 450, 493, 22 S. Ct. 354, 370, 46 L. Ed. 656, has this expression which seems to be so apposive in view of the facts of this case: "The doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It is not a mere lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief."

In referring to laches, Mr. Justice Campbell, in *Milligan* v. *Milligan*, 145 Va. 188, 133 S. E. 672, 673, says this: "To constitute laches there must be a delay that works a disadvantage to another."

"Laches, in legal significance, is not delay, but delay that works a disadvantage to another. * * * When a court sees negligence on one side and injury therefrom on the other, it is ground for denial of relief." *Chase* v. *Chase*, 20 R. I. 202, 37 Atl. 804, 805, 5 Pomeroy

Eq. Jur. —— (1 Pomeroy Eq. Remedies), section 21, page 39; *Ruckman* v. *Cox*, 63 W. Va. 79, 59 S. E. 760; *Snyder* v. *Charleston, etc., Co.*, 65 W. Va. 1, 63 S. E. 616, 131 Am. St. Rep. 947; *O'Neal* v. *Moore*, 78 W. Va. 296, 88 S. E. 1044; *Wellman* v. *Virginian R. Co.*, 85 W. Va. 169, 101 S. E. 252; *Carter* v. *Price*, 85 W. Va. 744, 102 S. E. 685.

In Michie's Ency. Digest Va. & W. Va. Reports, Vol. 4, Cum. Supp., page 211, this is said: "As to what delay will constitute laches must depend upon the circumstances of each suit. But whenever the delay fairly justified the inference of acquiescence in the adverse claim, or whenever it has been of such a character as to induce other persons to alter their circumstances or conduct, so that the element of estoppel is introduced, a court of equity will commonly hold the delay to operate as an absolute bar." *Inge* v. *Inge*, 120 Va. 329, 336, 91 S. E. 142; *Camp Mfg. Co.* v. *Green*, 129 Va. 360, 106 S. E. 394; *Selden* v. *Kennedy*, 104 Va. 830, 52 S. E. 635, 4 L. R. A. (N. S.) 944, 113 Am. St. Rep. 1076, 7 Ann. Cas. 879; *Hale* v. *Hale*, 62 W. Va. 609, 59 S. E. 1056, 14 L. R. A. (N. S.) 221; *Depue* v. *Miller*, 65 W. Va. 120, 64 S. E. 740, 23 L. R. A. (N. S.) 775.

It has been said: "The cases all proceed upon the theory that laches is not like limitation, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties." 18 Am. & Eng. Ency. Law (2d ed.) 119.

The brief of the learned counsel for the appellant fully recognizes this rule, containing this clear statement: "The rule in Virginia is that where there is a

question of laches, each case. is governed by its own circumstances; sometimes the analogy of the statute of limitations is applied; sometimes a longer period than that prescribed by the statute is required; in some cases a shorter time is sufficient; and sometimes the rule is applied where there is no statutory bar. *American Surety Co.* v. *White*, 142 Va. 1, 127 S. E. 178. The mere lapse of time, unaccompanied by circumstances affording evidence of a presumption that the right has been abandoned, is not considered laches. *Tidball* v. *Shenandoah National Bank*, 100 Va. 741, 42 S. E. .867, and cases cited in 9 Ency. Dig. of Va. & W. Va. Rep., page 95. Laches cannot be predicated of those who are ignorant of their rights. Such a defense is only permitted in equity to defeat an acknowledged right on the ground that it. affords evidence that the right has been abandoned. *Massie* v. *Heiskell*, 80 Va. 798; *Rowe* v. *Bentley*, 29 Gratt. 756, 763; *Jameson* v. *Rixey*, 94 Va. 342, 26 S. E. 861, 64 Am. St. Rep. 726. It is only where injustice will be done that the court declines to interfere on the ground of laches. *Dillard* v. *Jefferies*, 118 Va. 81, 85, 86 S. E. 844. Laches in legal significance is not delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether a right is pressed promptly or slowly within the limits allowed by law. The disadvantage may come from loss of evidence, change of title, intervention of equities and the like, but there must be prejudice from the delay.''

Applying these well established rules, it is clear that the surety company has been so prejudiced by the long silence and acquiescence of the bank that it would be inequitable to grant the bank the relief which·it has

delayed so long to seek that Alexander in the meantime has become insolvent.

If anything more should be needed to convince the impartial mind that the decree of the trial court is right, it may be found in the report of the commissioner, who marshals all the facts (some of which for the sake of brevity we have omitted) in a striking and convincing way.

*Affirmed.*