# Staunton

J. T. STRICKLAND V. MARCELLA E. AYERS, ET AL.

September 22, 1932.

Present, Holt, Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*Woods, Chitwood, Coxe & Rogers,* for the plaintiff in error.

*Engleby & Engleby* and *Robert C. Jackson,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

By deeds dated May 28, 1921, and December 13, 1924, appellant conveyed 120 and twenty acres of land lying in Brewster county, Texas, to E. P. Ayers, who in consideration therefor paid $2,400, or its equivalent, for the 120 acres, and for the twenty acres gave four notes for $100, each, payable one, two, three and four years after date to the order of J. T. Strickland. Ayers paid three of the notes

and on April 12, 1928, died testate. His daughter, Miss Lessie F. Ayers, qualified as executrix under his will. Appellant, on or about December 13, 1928, the due date of the fourth and last of the above-mentioned notes, demanded payment of the executrix. At that time she was under the impression that the estate was obligated to honor the note, but did not pay it then. Later, after investigaiton, she determined that both sales were voidable and in behalf of the estate filed the bill in this suit, charging appellant with having made misrepresentations which induced her father to purchase the two tracts of land, offering to reconvey the same to him, and praying for return of the consideration paid and cancellation of the $100 note due December 12, 1928. From a decree granting relief according to the prayer of the bill this appeal was allowed.

Miss Lessie F. Ayers and Mrs. Marcella E. Ayers, the widow, testified that a day or two prior to May 28, 1921, appellant and his wife came to their home in Roanoke and for three hours, or more, in their presence, sought to induce E. P. Ayers to buy a part of the land appellant owned in Brewster county, Texas. They were shown a map of this property upon which were numerous marks which appellant stated indicated oil wells and borings for oil, some of them in close proximity to the land he desired to sell. Appellant furthermore stated that there were oil-producing wells in the county, and even if there was no oil on the 120 acres the land was well worth $20 per acre, as it was level, well watered, good farming and grazing land; that he and his wife had just returned to Roanoke from Texas, where they had inspected the land and had seen cattle thereon grazing in grass knee deep. Mrs. Strickland, in reply to a question, said that she did not get oil on her shoes, "but there seemed to be plenty of it there."

T. J. Miller, a surveyor and tax assessor in Brewster county, testified that section 78, block G-1, in which the two tracts in question are located, is very rough and rocky; in fact, so broken and rough that it is difficult to reach, part of

it being impenetrable; that he could not get through it "and nobody else could;" that the land is not well watered, indeed, it has no permanent water supply. He stated that there were no oil-producing wells in Brewster county, that the nearest oil field to this section was at least ninety miles away; that the land was good neither for farming nor grazing; that its market value in 1921 was, and still is, not more than $1.00 per acre, and that it was assessed for taxation at seventy-five cents per acre.

The statement of Miller as to the location, condition, character and value of the land is not controverted, and hence if the representations alleged were made their falsity is established.

The primary issue involved is whether or not Strickland made the statements alleged. Two witnesses affirm, and two deny, that he did. Appellant stated on cross-examination that neither he nor his wife had ever seen the land, but that in 1920 or 1921, he was uncertain just when, he had purchased for three dollars per acre some 9,600 acres in Brewster county, Texas, and that he and his agents had sold or divided 9,400 acres of this tract; he admitted writing letters in the fall and winter of 1920 in which are found similar representations to those alleged, but made to other parties as inducements to them to buy portions of this tract. Several of the letters introduced in evidence in the case at bar were involved in *Strickland* v. *Cantonwine*, 140 Va. 193, 211, 124 S. E. 292, 297, where this is said of them:

"These letters are so at variance with the testimony of the defendant, protesting his good faith and his innocence of misrepresentation, that we are of opinion that the learned chancellor who entered the decree under review was abundantly justified in disbelieving his testimony upon the material issues in the cause."

It is insisted that the letters were not relevant evidence in this case because they were written several months prior to May 28, 1921, addressed to other parties, and were never seen by Ayers. The letters, written between July 9, 1920,

and December 20 of the same year, establish the fact that during this time Strickland was making reckless or untrue statements in his efforts to obtain purchasers for the land. There is nothing in the evidence to show that between December 20, 1920, and May 28, 1921, Strickland's conduct, course of dealing, or attitude of mind had changed with reference to the sale of the land. Under these circumstances, the letters were not only admissible but are convincing evidence of the fact that he did make the representations alleged.

In support of his contention, appellant introduced the following statement, signed by Ayers:

"ROANOKE, VA., *November 19, 1924*

"This is to certify that I agree to sell 120 acres of land or any part of same land which I own in Brewster county, Texas, for $150.00 per acre, this land being the north 3-4 of the north east 1-4 Sec. 78 Block G-1—Cer. 266—D. & W. Ry. survey. I do not guarantee the quality of this land or the amount of oil as it was not guaranteed to me when I bought it—but from recent information this land seems to be increasing in value all the time."

Up to this point the statement is typewritten, the following is in Dr. Strickland's handwriting:

"I will not make deed to this at above price if I feel inclined to change my mind or if I have already made other arrangements. The above price is $150.00 per acre."

The sentence, "I do not guarantee the quality of this land or the amount of oil, as it was not guaranteed to me," standing alone, would probably be sufficient to sustain appellant's contention; but when considered, as it must be, in the light of surrounding facts and circumstances, it creates in an impartial mind a strong suspicion that the statement was obtained for the purpose of being used, if necessary, as evidence to refute the charge of misrepresentation in making the sale. The right of Strickland to obtain evidence to protect himself against a false charge which he

had ground to believe might be made against him is unquestioned, but he does not claim that this was his purpose in obtaining the statement. He testified that Ayers wanted him to sell the 120 acres, and that in view of that request he prepared the statement for his own protection. When asked: "Why was it necessary if he was putting this land in your hands to sell, for a memorandum to be made in which he said that he would not agree to sell this 120 acres of land in Brewster county for $150.00 an acre? You would have had no trouble carrying that in your mind, would you?" He replied: "After he agreed to that, he changed his mind and made me add the remainder of the agreement, and I don't like to do things unless I know people are carrying them out, and I did that for my own protection."

The circumstances under which the statement was obtained were: Strickland had been Ayers' family physician for more than twenty years. This relation had terminated prior to 1924, just when, is not disclosed, but regardless of when it terminated, Ayers reposed great confidence in Strickland. Shortly after the opinion in the *Cantonwine Case* was published, in which this court in no uncertain terms expressed its disapproval of the methods used to induce Mrs. Cantonwine to become a purchaser, Strickland 'phoned Ayers to come to his office, and then, or soon thereafter, Ayers signed the paper in question. Strickland knew of the decision in the *Cantonwine Case*, Ayers did not.

Just why Ayers should list this property for sale with Strickland is not clear, as Strickland was not a real estate agent and owned land in the same locality which he desired to sell. The statement itself shows that Ayers was not then willing to state the price he would take; Strickland had no prospective purchaser in view, the only thing he did, or contemplated doing, was to mention the land to an acquaintance in Florida, who was not even interested. If it was expedient for Ayers to agree in writing that appellant should sell the land for him, it does not appear necessary for appellant to have incorporated in such writing the

sentence, "I do not guarantee the quality of this land or the amount of oil as it was not guaranteed to me when I bought it—but from recent information this land seems to be increasing in value all the time." This is irrelevant to the purpose which appellant claims he had when he asked for the memorandum. The terms stated are contradictory; the typewritten portion indicates that Ayers was listing the property for sale with Strickland at $150 per acre, the last sentence indicates that he was unwilling to authorize a sale at that price. If the purpose in securing the statement was to protect Strickland in making a sale for Ayers, it is inconceivable how such an uncertain, contradictory statement could accomplish that end.

The writing further shows that at that time Ayers had an exaggerated opinion of the value of the land, out of all proportion to the true value. This exaggerated opinion originated, in part at least, from statements made to him by appellant. If the truth had been made known to Ayers, however credulous he might have been he could not have had such an exalted idea of the value of the land. The truth was known to appellant. He had been engaged in a suit which involved the tract of which this was originally a part, and witnesses familiar with conditions and the value of the lands in that locality had definitely stated on the witness stand that the property was practically worthless, either as a prospective oil field or as farming land, and yet Strickland states that he was willing to undertake to sell for a friend this land at $150 per acre. We agree with the learned chancellor who held that the writing, construed in the light of the circumstances existing at the time it was signed, was neither sufficient to confirm a previous fraudulent sale nor to prove that no misrepresentation was made.

In *Fitzgerald* v. *Frankel*, 109 Va. 603, 64 S. E. 941, 943, this is said: "When the original transaction is infected with fraud, the confirmation of it is so inconsistent with justice and so likely to be accompanied with imposition that

the courts watch it with the utmost strictness, and do not allow it to stand but on the clearest evidence."

It is claimed that even if the misrepresentations were made, Ayers was not induced by them to make the purchase. This contention is based on the testimony of appellant and one W. O. Trenor. Strickland states that Ayers knew more about conditions in Brewster county than he did. He seems to have based this conclusion on what he claims Ayers told him, and clippings and other literature which Ayers showed him. No attempt is made to prove from what source Ayers obtained these clippings or their contents.

If there was any substantial evidence in existence to show that conditions and the character of the land were otherwise than were proven in the *Cantonwine Case* or as testified to by Miller in this case, Strickland has failed to introduce it into either of these records. In view of this positive testimony, it is absurd to state that Ayers at any time knew conditions in Brewster county better than appellant did. There is no evidence that Ayers knew anything about the location, character, or value of the land in question prior to the time he bought the 120 acres from appellant.

W. O. Trenor stated that he had been speculating in land in Brewster county and that Ayers in 1924, and later, frequently discussed the matter with him, but when asked to state the price he paid for his land, or the price he obtained when he sold it, he refused to do so. He did state that there was no oil in Brewster county, but there was a lot of "wild-catting," which he defined to mean, "Drilling wells where they get salt water or dry holes—no oil." From this evidence, it seems a fair inference that the drilling of such wells was for the purpose of deceiving the unwary and not a bona fide effort to obtain oil. While Mr. Trenor was under no legal duty to inform Ayers of the true condition, from the tenor of his own testimony it is certainly a fair inference to conclude that he did not.

When Strickland made representations concerning the location and character of the land he was trying to sell, it was his duty to confine himself to the facts; but even though he believed the representations to be true, if, in fact, they were false and the parties to whom they were made acted upon them, his belief in their truth or falsity is immaterial. Regardless of Strickland's belief concerning the statements made, he knew that a few months before the first sale to Ayers he had paid only $3.00 per acre for the land; that he had never seen it, although he was in the State of Texas at the time he made the purchase; that he had done nothing to enhance its value; that after the evidence was taken in the *Cantonwine Case* that record was available to him, and it reveals the true condition, location, character and value of the land.

Ayers, on the other hand, was closely confined to his duties as a member of the police force in the city of Roanoke; the land was situated in southern Texas, many hundreds of miles from Roanoke; Ayers, with the limited time at his disposal, could not, without great sacrifice, have made a personal inspection of the property; the only people in Roanoke whom the record discloses could have given him the correct information failed to do so, though they talked with him frequently about the matter; he knew nothing about the *Cantonwine Case*, and died believing that the land he purchased from appellant was exceedingly valuable. We do not know what Mr. Trenor told him, or the information contained in the newspaper articles which were sent him by unnamed parties. We do know what appellant told him as an inducement for him to buy the 120 acres. Ayers had a right to rely upon the statements made to him by appellant.

The rule applicable to this state of facts is succinctly stated by Judge Staples in *Grim* v. *Byrd*, 32 Gratt. (73 Va.) 293, as follows:

" * * * if the purchaser has not equal means of information with the seller, if it be a case in which he had

the right to rely upon the representation, the evidence to show that he did not rely upon it, but upon information obtained elsewhere, must be of the clearest and most satisfactory character. In such cases, there ought to be no room for inference on mere implication. Pomeroy on Contracts, sections 221, 4, 5 and 6. See also *Slaughter's Adm'r* v. *Gerson*, 13 Wall. (U. S.) 379 [20 L. Ed. 627]." *Fitzgerald* v. *Frankel, supra; Strickland* v. *Cantonwine, supra.*

■ No one knows what was said when the sale of the twenty acres was consummated on December 12, 1924, except the parties themselves. Ayers is dead, so we are confined to the version given by appellant, which is as follows:

"Q. Did you, in connection with Mr. Ayers' purchase on December 12, 1924, of the additional twenty acres that he bought, make any representations whatever to Mr. Ayers about the land, the quality of it, topography, or with respect to the oil?

"A. No, I did not, but I told him this: I said I am going to insert in this deed that I am not guaranteeing the quality of the land or the amount of oil, and he said that was all right, that he would take it that way, bought the other that way and expected it that way.

"Q. Did you approach Mr. Ayers with respect to buying this additional twenty acres or did he approach you?

"A. He approached me, said he would like to have some more of the land at the same price.

"Q. Did Mr. Ayers come to your office between 1921 and December 12, 1924?

"A. Mr. Ayers came to my office, I will say, every few weeks—sometimes twice a week. He was frequently there, and at every visit he discussed the development and what was going on in Brewster county, Texas, and he frequently brought me clippings and literature and told me about what he had heard and what was going on down there. In other words, he knew a great deal more about it than I did.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. At the time and before the deed was executed by you, Dr. Strickland, to Mr. Ayers conveying this twenty acres of land, you did not say anything to him about the litigation that had taken place between you and other parties and of the denunciation of these transactions by the court?

"A. I did not.

"Q. I notice that in this deed of the 12th of December, this language occurs: 'The quality of the land or quantity of oil is not guaranteed by the vendors.' Had you ever put that in a deed before?

"A. Never did.

"Q. It was in view of the investigation in the *Cantonwine Case* and the decision of the court that induced you to put the qualification in this deed that was never contained in any other deed?

"A. I told him I preferred to put it in, and he was perfectly willing.

"Q. That was the last sale you ever made of any of this Texas land?

"A. I don't remember.

"Q. Think a little. You would remember that, I should think.

"A. I hardly think I have sold any since that."

We either have to accept or reject this evidence, there is no middle course open to us. Appellant himself connects the two sales, although in point of time more than three years separated them. The weight and reasonableness of the evidence force us to the conclusion that appellant by misrepresentations induced Ayers to purchase the 120 acres, hence that part of his testimony repeated in the interview with Ayers which resulted in the sale of the twenty acres has been rejected already and is of no weight here. Both in his testimony and in the deed to the twenty acres is found the same language which he used in the interview and the statement of November 19, 1924—*i. e.*, the quality

of the land and the quantity of the oil was not guaranteed. This likewise has been rejected for reasons above stated.

These repetitions, the relation of the parties, and the circumstances of the sale convince us, as they did the learned chancellor below, that the sale of the twenty acres is tainted with the same fraud which permeated the first sale. By his own letters, beginning in July, 1920, and extending to December 20, 1920, appellant is convicted of a fraudulent intent in connection with the sale of his Texas land. By the testimony of two witnesses, he is shown in May, 1921, to have had the same fraudulent intent in the sale of a part of the same land to Ayers. Thereafter, appellant claims, Ayers came to his office every few weeks, sometimes twice a week, and discussed developments and what was going on in Brewster county, when, as a matter of fact, nothing was going on there except "wild-catting."

Appellant, in the Cantonwine suit, was attempting to refute the charge of fraud made against him there, and was confronted with witnesses who were in a position to know the real conditions in Brewster county and the character and value of the land appellant had purchased and sold. There was no evidence to rebut the truth of their testimony. If the clippings and literature which appellant claims Ayers showed him had any foundation in fact, or if Ayers knew more about conditions in Texas than appellant did, it is very strange that he was not called as a witness in that case.

After appellant was unsuccessful in this court in that case he still showed his fraudulent intent in obtaining from Ayers his signature to the paper writing dated November 19, 1924. Ayers on that date, on December 12, 1924, and until his death, believed the representations appellant made to him in May, 1921. The conclusion is irresistible that appellant, with the same fraudulent intent which had previously dominated him, induced the sale on December 12, 1924, while Ayers was laboring under the mistaken belief that the 120 acre tract and the twenty adjacent acres he was then purchasing were situated in close proximity to

oil producing wells, and were suitable for grazing and farming purposes. To rescind the sale of the 120 acres and refuse to rescind the sale of the twenty acres would be, in effect, holding that between November 19 and December 12, 1924, appellant had purged himself of his fraudulent intention and changed his course of dealing with this land. Such a conclusion, under the established facts, would be contrary to the experience of mankind.

The following excerpt is found in *Hazlewood* v. *Forrer*, 94 Va. 703, 707, 27 S. E. 507, 508:

"The circumstances attending and following a transaction are often of such character as to leave not even a shadow of a doubt as to the real object and motive of the parties engaged in it. * * * Experience attests that in a majority of cases fraud can only be established by circumstances. The motives and intentions of the parties can only be judged of by their actions, and the nature and character of the transaction in which they are engaged. They often furnish more conclusive evidence than the most direct testimony."

The same language is quoted with approval in *Fitzgerald* v. *Frankel, supra,* and *Long* v. *Harrison,* 134 Va. 424, 114 S. E. 656.

The misrepresentations which the evidence establishes were not confined to the 120 acres, but extended to all the land that appellant owned in that vicinity. The fraudulent intent proved permeated at least two sales of land to Mrs. Cantonwine, lying in another section but not far from the land sold to Ayers, as well as in the two sales made to Ayers.

Under the circumstances, the fact that appellant incorporated in the deed to the twenty acres the sentence, "the quality of the land or quantity of oil is not guaranteed by the vendors," is itself a suspicious circumstance. As was stated in *Bridger* v. *Goldsmith,* 143 N. Y. 424, 38 N. E. 458, 459: "It is difficult to conceive that such a clause could ever be suggested by a party to a contract, unless there was

in his own mind at least a lingering doubt as to the honesty and integrity of his conduct."

Such a clause in a contract or deed to either personalty or realty will not preclude a party from the right to rescind, if, in fact, the contract or deed was induced by fraud in its procurement. See *Jordan* v. *Nelson* (Iowa), 178 N. W. 544, 10 A. L. R. 1464, and note.

The appellant urges that the complainants are precluded by the doctrine of laches from obtaining a rescission of the conveyances. The doctrine of laches is fully discussed and the authorities reviewed by Chief Justice Prentis in the case of *National Valley Bank* v. *Fidelity Co.*, 153 Va. 484, 150 S. E. 403, 406, where, among other things, it is said:

"Laches in legal significance is not delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether a right is pressed promptly or slowly within the limits allowed by law. The disadvantage may come from loss of evidence, change of title, intervention of equities and the like, but there must be prejudice from the delay."

Applying the doctrine of laches to the facts in the case at bar, it is established that there had been no appreciable change in the value of the land; it was one dollar per acre in 1921 and in 1930. Ayers died believing that he owned valuable property in Texas and that his estate would reap large profits from this land. Strickland has no right to complain of the fact that Ayers, for a period of seven years, continued to believe in the fictitious value of the land, as it was proven that this belief was implanted in his mind by Strickland himself. It is established that the true condition of affairs was unknown to the executrix and other members of Ayers' family until the spring of 1929, and within three months after ascertaining the fact this suit was instituted. There are no creditors to be affected by the rescission of the transaction here under review, and no

change has taken place in the title or condition of the property to the detriment of the appellant.

The appellant contends that Ayers' death deprives him of evidence and constitutes a prejudice which precludes rescission. Formerly, when the death of one party prevented the other from testifying, the reason suggested by counsel had some effect, but it is difficult to understand how the death of Ayers, and the fact that his voice is forever hushed, can be regarded as prejudicial to the appellant, who testified in the case. This case is not within the meaning of the rule that the death of parties and the loss of material evidence may preclude rescission. The delay in instituting the suit is considerable, but the land lies in a distant State and it was difficult for one situated as Ayers was to obtain accurate information concerning the location or character of the land and the true conditions surrounding it. Both Strickland and his wife testified fully regarding the matter, and it does not appear that he has been prejudiced by the delay.

The application of the doctrine of laches depends upon the circumstances of each particular case. It is not mere lapse of time, but a change of situation during neglectful repose which renders it inequitable to afford relief. *O'Brien* v. *Wheelock,* 184 U. S. 450, 22 S. Ct. 354, 46 L. Ed. 636; *Milligan* v. *Milligan,* 145 Va. 184, 188, 133 S. E. 672; *National Valley Bank* v. *Fidelity Co., supra.* There has been no change of circumstances, no intervention of equities, no loss of evidence, no prejudice to the appellant which demand the application of the doctrine to the facts in this case.

It was suggested in the oral argument that the parties were not in position to be placed *in statu quo* because the $2,400 named as the purchase price of the 120 acres was not paid in cash, but in the exchange of land and the sale of notes, which could not be restored. The uncontradicted evidence shows that in consummating the deal in May, 1921, Strickland did receive from Ayers a deed to

a lot which he owned in the city of Roanoke, valued at $3,000, and certain notes secured by deeds of trust on real estate, in consideration of which he conveyed the 120 acres to Ayers and gave his check to Ayers for the difference. It appears that within a few days after this sale was consummated Ayers, acting for Strickland, sold the lot for $3,100, and that Strickland received the cash therefor. There is no evidence showing that the notes which Strickland received were not duly paid. While it is true that Ayers did not pay the $2,400 cash in consideration for the conveyance, he did exchange valuable assets, all of which have been reduced to cash. The situation, then, is the same as if Ayers had paid the consideration for the conveyance in cash.

We are of opinion that the decree of the trial court is plainly right, and it is affirmed.

*Affirmed.*

EPES, J., dissenting.