**ATLANTIC PERMANENT FEDERAL
SAVINGS AND LOAN
ASSOCIATION, Plaintiff–Appellee,**

v.

**AMERICAN CASUALTY COMPANY
OF READING, PENNSYLVANIA,
Defendant–Appellant.**

No. 87–1572.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 4, 1987.

Decided Feb. 12, 1988.

John Bowers McCammon (Edward E. Nicholas, III, Wright, Robinson, McCammon & Tatum, P.C., Richmond, Va., Steven S. Radin, Kenneth F. Oettle, Davis J. Howard, Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, Newark, N.J., on brief), for defendant-appellant.

Walkley Elmes Johnson, Jr. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for plaintiff-appellee.

Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

PER CURIAM:

American Casualty Company (American) appeals a judgment against it in an action for breach of a directors' and officers' liability insurance policy that American issued to Atlantic Permanent Federal Savings and Loan Association (Atlantic). We find no reversible error and affirm.

## I

The policy at issue contains two parts. Clause A provides direct coverage for Atlantic's individual officers and directors.[1] Clause B insures Atlantic itself against certain indemnification payments it makes to individual officers or directors.[2] The policy was initially issued in 1973. In February of 1984, Atlantic made application on American's form to renew the policy for a one-year period beginning March 1, 1984. Atlantic's application, which was signed by its chief executive officer, Edgar Everhart, contained the following question: "Has there been during the past policy period, or is there now pending, any suit against [Atlantic] or its subsidiaries?" Everhart answered "Yes" to this question and attached, by way of explanation, a copy of a letter from Atlantic's counsel, which purported to list all claims against Atlantic that were then pending or threatened. Though the letter accurately listed all pending and threatened claims against Atlantic, it did not reveal that several other claims, later settled, had been filed against Atlantic during the prior policy period. Based in part on this letter, American granted Atlantic's application for renewal.

In September of 1984, during the renewal period, several Atlantic loan customers filed suit against Atlantic, its subsidiary Colonial Services Corp. (Colonial), and three of Atlantic's officers—Willis Stephenson, Harry Knickerbocker, and Warren Fisher. The loan customers alleged that the defendants had engaged in various fraudulent and deceptive sales tactics in connection with Atlantic's home improvement loan program. Atlantic retained its general counsel, Crenshaw, Ware & Johnson, to defend Atlantic, Colonial, and officers Knickerbocker and Fisher. The remaining officer, Stephenson, employed the firm of Williams, Worrell, Kelly & Greer to defend him.

In July of 1985, the loan customers agreed to settle their claims against all five defendants for $115,000 plus $538,407 in attorney's fees. Atlantic's Board of Directors approved the settlement and agreed to indemnify the three officers named as

---

1. Clause A provides:

    [The Insurer agrees] [w]ith the Directors and Officers of the [Savings and Loan] Association that if, during the policy period any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns, all Loss which the Directors and Officers or any of them shall become legally obligated to pay.

2. Clause B provides:

    [The Insurer agrees] [w]ith the [Savings and Loan] Association that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Association, all Loss for which the Association is required to indemnify or for which the Association has, to the extent permitted by law indemnified the Directors and Officers.

defendants for all costs of defense and settlement. Atlantic accordingly paid the loan customers $115,000 in settlement and $538,407 in attorney's fees. Atlantic also paid $481,563 to Crenshaw, Ware for the defense of Atlantic, Colonial, and officers Knickerbocker and Fisher, and $303,001 to Williams, Worrell for the defense of Stephenson. Atlantic then made demand upon American for these expenses, which it claimed were covered by its directors' and officers' liability insurance policy. When American denied coverage, Atlantic filed this action for breach of contract.

American asserted five basic defenses to coverage: (1) that the policy renewal was void because it was procured through a material misrepresentation; (2) that Atlantic had no standing to sue under the policy, because the losses claimed were not covered by Clause B and it had no right to proceed under Clause A; (3) that the losses claimed fell within a policy exclusion for dishonest conduct; (4) that the losses claimed stemmed from the officers' intentional wrongdoing, which was uninsurable as a matter of public policy; and (5) that even if there was coverage, it was limited to that portion of the defense and settlement costs which had been incurred on behalf of the three insured officers, as opposed to Atlantic and Colonial.

The district court eliminated two of these defenses at the summary judgment stage, ruling that Atlantic was entitled to proceed under Clause A as subrogee to the rights of the insured officers whose expenses it had paid, and that the dishonesty exclusion was inapplicable to that claim. The case then proceeded to trial before a jury. At the close of Atlantic's evidence, American made a motion for directed verdict, which it renewed at the close of all the evidence. The motion contended, inter alia, that At-

lantic had failed adequately to prove its damages. The district court delayed ruling on the motions and submitted the case to the jury for special verdict on a number of issues, including: (1) whether the renewal application contained a misrepresentation of fact of which officers Stephenson, Knickerbocker, and Fisher were aware, and (2) what portion, if any, of the expenses sought had been incurred on behalf of the insured officers, as opposed to Atlantic and Colonial. The jury found that there had been no knowing misrepresentation on the part of the three officers, and that $947,536 of the $1,437,971 in expenses claimed were allocable to them. The district court thereupon entered judgment for Atlantic in that amount. American filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, on the grounds raised in the earlier motions for directed verdict. The district court denied this motion. American then moved under Fed.R. Civ.P. 59(e), to amend the verdict to reflect the policy's $10,000 deductible, which it claimed should be applied multiple times. The district court granted the motion to amend, but applied the deductible only once, reducing the judgment to $937,536. This appeal followed.

## II

### A

■ American first argues that the district court erred in instructing the jury that any misrepresentations in the renewal application would bar Atlantic's recovery only if American proved that the individual officers in whose shoes Atlantic stood as subrogee had knowledge of them.[3] Under Virginia law, which governs the interpretation of this contract,[4] a misrepresentation of ·

3. The court instructed the jury as follows:

Now, you are to determine whether or not a false statement was made and whether the three officers in question knew of it, because the policy issued itself carries a provision. The wrongful act of any director or officer shall not be imputed to any other director or officer for the purpose of determining the applicability of whether the policy may be

excused. So keep that only in mind as to that fact.

4. In this diversity case, the district court was required to apply the choice-of-law rules of the state in which it sat—Virginia—in deciding which state's substantive law to apply to this contract. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Virginia, the interpretation of a contract is governed by the law of the place where it was

fact in an insurance application renders the policy void if the misrepresentations were material to the risk when assumed. Va. Code Ann. § 38.2–309 (1986). The Virginia Supreme Court has, however, specifically upheld provisions in insurance policies that limit the insurer's right to void the policy for misrepresentation. *See, e.g., Sterling Ins. Co. v. Dansey,* 195 Va. 933, 81 S.E.2d 446 (1954) (enforcing clause providing that coverage could not be avoided unless misrepresentation in application was made with knowledge of its falsity). This particular insurance policy contained such a provision: paragraph 7(a) expressly provided that "this policy shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the [application] form, except as to those persons making such statement or having knowledge of its untruth." American seeks to avoid the impact of this provision by arguing that any misrepresentations made in the renewal application, whether by these officers or by others, rendered the entire policy void from the moment of signing. American argues that paragraph 7(a) therefore affords no protection to Atlantic, as subrogee to the rights of the "innocent" officers, because it never became effective.

We reject this argument. Paragraph 7(a) was plainly designed to prevent misrepresentations made by the particular officers responsible for preparing an application form from depriving their innocent colleagues of coverage, and to refuse to give it effect here would undermine the parties' manifest intent. The language of the policy is plain and unambiguous, and we are obligated to apply it, absent a showing that it is in violation of law or inconsistent with public policy. *See Sterling Ins. Co. v. Dansey,* 81 S.E.2d at 450. Though paragraph 7(a) provides the insured officers with greater protection than would otherwise be available to them under the law of Virginia, we have not been shown that it is inconsistent with any expressed public policy of that state.

## B

■ American next contends that the district court erred in ruling, on summary judgment, that Atlantic was entitled to proceed against it under Clause A of the policy, as subrogee to the rights of the insured officers whose defense and settlement expenses Atlantic had paid.[5] American concedes that Atlantic did in fact pay these expenses and that, under normal principles of subrogation, it would thereby succeed to any rights that the officers themselves might have against American under the policy. American contends, however, that it was error to allow subrogation in this case, for two basic reasons. We find neither persuasive.

First, American argues that the contract itself either expressly or by implication limited Atlantic's rights against the insurer to those available to it under Clause B—that is, that Clause B was intended to "preempt" any subrogation rights that At-

---

made, absent an express contract provision to the contrary. *C.I.T. Corp. v. Guy,* 170 Va. 16, 195 S.E. 659 (1938). Since this insurance contract was made in Virginia, Virginia law governs its interpretation.

5. Atlantic was not entitled to proceed against the insurer in its own right, under Clause B of the policy. Clause B insures Atlantic itself against those losses "for which [it] is *required to indemnify,* or for which [it] *has, to the extent permitted by law, indemnified* the Directors and Officers" (emphasis added). As a federally insured savings and loan, Atlantic was required to indemnify its officers and directors for losses incurred in the defense and settlement of actions brought against them in their official capacity, but was permitted to do so only in accordance with certain procedures prescribed by the Federal Home Loan Bank Board (FHLBB).

See 12 C.F.R. § 545.121 (1985). The undisputed facts establish that Atlantic failed to comply with these procedural requirements in two respects: it did not give the FHLBB 60 days advance notice of its intention to indemnify the officers, as required by 12 C.F.R. § 545.121(c)(2), and it advanced defense and settlement costs to the officers without requiring them to sign a written agreement to make restitution in the event they were later found not entitled to indemnification, in violation of 12 C.F.R. § 545.125(e). Because of these violations of applicable federal regulations, Atlantic's indemnification of officers Stephenson, Knickerbocker, and Fisher was not "permitted by law," and it was therefore precluded from recovering directly from the insurer under Clause B.

lantic might otherwise have at common law. We disagree. Clause B does provide Atlantic with greater rights against American than it would have as common law subrogee, for the various exclusions from coverage set forth in paragraph 3(a) are specifically inapplicable to claims made under it. But nothing in the language of Clause B indicates that it was intended to nullify any common law rights of subrogation that Atlantic might have against the insurer. Had American wished Clause B to have this effect, it could have said so expressly. Having failed to do so, it cannot look for relief to the courts, which are bound in cases of doubt to construe the contract against the insurer. *See St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.,* 227 Va. 407, 316 S.E.2d 734, 736 (1984).

Second, American argues that allowing Atlantic to proceed as common law subrogee would violate the general principle that equitable relief should not be granted to one with unclean hands, here by permitting Atlantic to recover under an insurance policy that it procured through material misrepresentations. Again, we disagree.

It is true that, under Virginia law, as generally, subrogation is not a matter of absolute right but an equitable remedy whose availability depends upon the facts and circumstances of the particular case. *Federal Land Bank v. Joynes,* 179 Va. 394, 18 S.E.2d 917, 920 (1942); *see National Valley Bank v. United States Fidelity & Guaranty Co.,* 153 Va. 484, 150 S.E. 403 (1929) (right of subrogation denied because of laches). But the essential purpose of the doctrine of subrogation is to secure the ultimate discharge of a debt by the party who ought in equity to pay it, notwithstanding the technical failure to take an assignment. *See Federal Land Bank v. Joynes,* 18 S.E.2d at 923. In this case, we

think it plain that the ultimate burden of paying the defense and settlement costs incurred by officers Stephenson, Knickerbocker, and Fisher should rest in equity upon American, which expressly obligated itself by contract to provide them with liability insurance coverage even if their colleagues made material misrepresentations in the insurance application, so long as they themselves were unaware of those misrepresentations. To allow American to escape this obligation, for which it was certainly well compensated, by somehow imputing the misconduct of the officers who prepared the application to Atlantic itself would be manifestly unjust. Such a result would not only undermine the fundamental purpose of the doctrine of subrogation, but also be inconsistent with Virginia's longstanding commitment to liberal application of that doctrine. *See Thompson v. Miller,* 195 Va. 513, 79 S.E.2d 643, 647 (1954); *Federal Land Bank v. Joynes,* 18 S.E.2d at 920. The district court did not err in granting summary judgment on this issue.

## C

■ American then argues that the district court erred in ruling, on summary judgment, that the dishonesty exclusion set forth in paragraph 3(a)(5) of the policy [6] was inapplicable because there had not been a final adjudication of deliberate dishonest conduct in the underlying action against the officers. The district court held that paragraph 3(a)(5) did not prevent the officers from recovering for losses caused by their dishonest behavior unless it was established in the underlying action itself, rather than a subsequent coverage suit, that they had committed "acts of active and deliberate dishonesty ... with actual dishonest purpose and intent." The district court reasoned that the phrase "a judgment or other final adjudication *there-*

---

**6.** Paragraph 3(a)(5) of the policy specifically excluded from coverage any loss that was *brought about or contributed to by the dishonesty of the Directors or Officers. However,* notwithstanding the foregoing, the Directors or Officers *shall be protected* under the terms of this policy *as to any claims upon which suit may be brought against them, by reason of any*

*alleged dishonesty* on the part of the Directors or Officers, *unless a judgment or other final adjudication thereof* adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty committed by the Directors or Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated.

*of*" was intended to refer only to "claims upon which suit may be brought against [the officers] by reason of [their] alleged dishonesty."

American contends here that this interpretation renders the dishonesty exclusion virtually meaningless because it permits officers to recover the cost of defending claims based on their dishonest behavior simply by settling those claims before trial. In American's view, the first sentence of paragraph 3(a)(5) gives the insurer an absolute right to avoid coverage, regardless of the outcome of the underlying litigation, by establishing in a subsequent coverage action that the insured officers committed "acts of active and deliberate dishonesty ... with actual dishonest purpose and intent." The "however" clause, it argues, was intended only to make clear that *mere allegations* of dishonesty in the underlying action would not suffice to trigger the exclusion.

While we agree that the contract provision is ambiguous, a finder of fact seeking to resolve the ambiguity would be bound to construe the exclusion strictly against the insurer. *See St. Paul Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d at 736. Because we think a finder of fact thus constrained could reasonably interpret the provision only as did the district court, we conclude that the district court did not err in ruling on summary judgment that the exclusion was inapplicable. *See Pepsico, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656 (S.D.N.Y.1986) (rejecting, on summary judgment, precisely the same argument made by insurer as to identical exclusion language).

### D

■ American's next contention is that it should have been entitled to avoid coverage on the ground that conduct giving rise to the losses claimed was the sort of "intentional wrongdoing" that is uninsurable under Virginia law. This argument is without merit. The "wrongdoing" of which others here were accused was failure adequately to supervise the activities of dishonest contractors whose sales they financed. Virginia courts have never extended the "intentional wrongdoing" defense to conduct which, though itself "intentional," was not intended to cause injury. Instead, the defense has been confined to cases where the insured acted with the specific intent to cause harm. *See, e.g., Fedele v. National Liberty Ins. Co.*, 184 Va. 528, 35 S.E.2d 766 (1945) (pouring gas on an automobile and setting it on fire). Indeed, to adopt American's argument would be to render liability insurance virtually meaningless, for it would mean that the insured could never recover for harm caused by an act that was itself intentional —i.e., driving a car—even if that act was not specifically intended to cause injury, but was merely reckless or negligent as to the possibility that injury would occur. For this reason, we conclude that the district court did not err in ruling, as a matter of law, that the losses claimed were not for this reason uninsurable.

### E

■ After the jury returned its verdict for Atlantic, American once again asserted, by way of a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, its defense that Atlantic had failed adequately to prove its damages. The district court denied both motions, and American claims this was error.

Atlantic sought recovery under the policy for the following expenses incurred in the course of defending and settling the loan customers' claims:

$115,000 paid to the loan customers themselves in settlement;

$538,407 paid to the loan customers' attorneys;

$303,001 paid to Williams, Worrell for the defense of Stephenson;

$481,563 paid to Crenshaw, Ware for the defense of Atlantic, Colonial and the two remaining officers, Knickerbocker and Fisher; totalling

$1,437,971.

American was, of course, responsible for only those expenses that were reasonably allocable to the defense and settlement of

the claims against the three insured officers, as opposed to Atlantic and its subsidiary Colonial. The jury returned a verdict of $947,536.89 for Atlantic, allocated as follows: $411,902.50 for expenses incurred on behalf of Stephenson and $535,634.39 for expenses incurred on behalf of Knickerbocker and Fisher.

American asserts that Atlantic failed to carry its burden of proof in two respects: it failed to present sufficient evidence that the settlement costs ($115,000 plus $538,-407 in attorney's fees) and the $481,563 Crenshaw, Ware fee were properly allocable to the insured officers, and it failed to present sufficient evidence that the attorney's fees paid to Williams, Worrell and Crenshaw, Ware were reasonable. American therefore challenges the district court's refusal to disturb the verdict to the extent that it represents reimbursement for settlement expenses and legal fees, a figure which it estimates at $947,536.89.[7] This would, of course, leave nothing standing of the $937,536 verdict. In the alternative, American asks that it be granted a new trial on damages.

We address first the propriety of the district court's denial of the motion for judgment notwithstanding the verdict. A district court may properly grant a motion for judgment notwithstanding the verdict only when the evidence, viewed in the light most favorable to the nonmoving party, cannot support a verdict in that party's favor. *See Lust v. Clark Equip. Co.*, 792 F.2d 436, 437–38 (4th Cir.1986). If there is sufficient evidence from which a jury could reasonably have returned the verdict it did, the motion must be denied. *Id.* Applying this standard, we conclude that there was sufficient evidence to support the damages awarded here.

Under Virginia law, a plaintiff has the burden of proving the amount of his damages with reasonable certainty, but he is not required to do so with mathematical precision; he need only present sufficient evidence "to permit an intelligent and probable estimate thereof." *Gwaltney v. Reed,* 196 Va. 505, 84 S.E.2d 501, 501–02 (1954). *See Hailes v. Gonzales,* 207 Va. 612, 151 S.E.2d 388 (1966). At trial, Atlantic presented the following evidence that the settlement expenses were properly allocable to the insured officers: the policy itself, which defined the "loss" against which the officers were insured as "any amount which [they] are legally obligated to pay," and the settlement agreement, which provided that each of the defendants, including the three insured officers was legally obligated for the full amount of the settlement. We think this evidence was sufficient to justify submission of the claim for settlement expenses to the jury.

Nor do we agree that Atlantic failed to submit sufficient evidence that the attorney's fees claimed were reasonable to justify the submission of that item of damages to the jury. Atlantic introduced both itemized bills from the attorneys and evidence showing that the bills had been paid. The district court found that this evidence was sufficient to raise a presumption that the amounts charged were reasonable, and we do not think this was error. We have been unable to locate any Virginia cases dealing with the precise question of what is sufficient evidence to get to the jury on a claim for attorney's fees under a liability insurance policy. The case most nearly on point, *Walters v. Littleton,* 223 Va. 446, 290 S.E.2d 839 (1982), holds only that the presentation of *medical* bills regular on their face *may* be sufficient to create a jury question on the reasonableness of

---

7. American arrived at this figure in the following manner. Because Williams, Worrell defended only the insured officer Stephenson, all $303,001 of the payment to it was covered by the policy. The remaining $108,901.50 of the $411,902.50 Stephenson award was therefore for unallocated settlement expenses and should be set aside. Of the $481,563.39 paid to Crenshaw, Ware, only $120,390.75 was for the defense of Fisher and Knickerbocker (according to Ameri-

can's expert witness). The remaining $415,-243.64 of the $535,634.39 award for expenses incurred on behalf of Fisher and Knickerbocker was therefore for unallocated settlement expenses and should be set aside. All told, then, American claims that $524,145.14 of the verdict ($108,901.50 + $415,243.64) represented unallocated settlement costs, and that $423,391.75 represented allocated but unreasonable attorney's fees.

those charges, depending on the facts of the particular case. *Id.* at 842. But cases in other jurisdictions hold that the introduction of a paid bill, supported by testimony of the claimant or his agent, is sufficient to create a prima facie case that an expense claimed as damages under an insurance policy was reasonable. *See, e.g., Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 942 (D.C.Cir.1984). Once the claimant presents such evidence, the burden of production then shifts to the insurance company to go forward with evidence showing that the charge was not reasonable. Id. at 942. We assume that a Virginia court faced with the issue would follow this general rule. If so, the evidence presented here was sufficient to get to the jury on the claim for attorney's fees. Atlantic introduced fully itemized bills for all legal expenses claimed and presented evidence that it had paid those bills. Kenneth Lambert, a member of the firm who represented Mr. Stephenson, testified at length about the amount of work he had done in defending Stephenson. American offered no evidence to rebut the presumption that the fees charged were reasonable. On this record, we think the district court was justified in submitting the claims for legal fees to the jury, for a reasonable jury could certainly have found that the fees claimed were reasonable. The district court correctly denied the motion for judgment notwithstanding the verdict.

Similarly, we do not think the district court erred in denying American's motion for a new trial on the damages issue. The grant or denial of a motion for new trial is addressed to the sound discretion of the district court and will not be reversed on appeal absent a showing of abuse of discretion. *See Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1433 (4th Cir.1985); *see generally* 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2818, at 118–20 (1973). We find no abuse of discretion here.

F

American's next argument is that the district court erred in refusing to apply more than one deductible to reduce the judgment. The deductible (or "retention") provision, which appears in paragraph 4(a) of the policy, reads as follows:

The insurer shall be liable to pay one hundred percent (100%) of any Loss ... in excess of the retention amount shown under Item 4 of the Declarations.... One retention amount shall apply to each and every Loss.

Item 4 lists the retention amount as $10,-000 for "each loss." The term "loss" is defined in paragraph 1(d) of the policy as follows:

The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay ... for a *claim or claims* made against [them] ... for *wrongful acts.*

(Emphasis added.) American argues that because each of the nine plaintiffs in the underlying action asserted seven causes of action against the insured officers, there were really 63 separate "losses" and $630,-000 ought therefore to be deducted from the judgment. In the alternative, American argues that it is entitled to have the deductible applied nine times, because there were nine separate "losses," each encompassing seven claims arising out of a single loan transaction. The district court rejected both arguments, holding that when the claims asserted against the insureds arise out of a series of interrelated acts—here, the planning and carrying out of Atlantic's home improvement loan program—they should be treated as a single "loss" for the purposes of calculating the deductible.

We do not think the district court erred in so interpreting the contract. Paragraph 1(d) of the policy specifically defines "loss" to include multiple claims. Paragraph 4(d) of the policy provides that, for the purposes of calculating the insurer's maximum coverage liability, "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts ... shall be considered a single loss." We think it highly unlikely that the parties intended the term "loss," which is given only one express definition, to have a dif-

ferent meaning in calculating the applicable deductible than it has in determining the insurer's maximum coverage. Finally, Virginia law requires us to construe all ambiguities in insurance contracts against the insurer and in favor of coverage. For these reasons, we conclude that the district court did not abuse its discretion in refusing to apply the deductible more than once.

## III

The remaining allegations of reversible error raised by American are without merit and do not require discussion. The judgment below is therefore affirmed.

AFFIRMED.