407 F.3d 631
RESOURCE BANKSHARES CORPORATION; RESOURCE BANK, Plaintiffs-Appellees,v.ST. PAUL MERCURY INSURANCE COMPANY, Defendant-Appellant.American Casualty Company of Reading, Pennsylvania; Erie Insurance Company; Federal Insurance Corporation; Great Northern Insurance Company, Amici Supporting Appellant.Resource Bankshares Corporation; Resource Bank, Plaintiffs-Appellants,v.St. Paul Mercury Insurance Company, Defendant-Appellee.American Casualty Company of Reading, Pennsylvania; Erie Insurance Company; Federal Insurance Corporation; Great Northern Insurance Company, Amici Supporting Appellee.
No. 04-1946.
No. 04-1962.
United States Court of Appeals, Fourth Circuit.
Argued: March 17, 2005.
Decided: May 11, 2005.

ARGUED: Charles E. Spevacek, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota, for St. Paul Mercury Insurance Company. William Edgar Spivey, Kaufman & Canoles, Norfolk, Virginia, for Resource Bankshares Corporation and Resource Bank. ON BRIEF: Alan B. Rashkind, Furniss, Davis, Rashkind And Saunders, P.C., Norfolk, Virginia, for St. Paul Mercury Insurance Company. R. Johan Conrod, Jr., Kaufman & Canoles, Norfolk, Virginia, for Resource Bankshares Corporation and Resource Bank. Andrew Butz, William H. White, Jr., Bonner Kiernan Trebach & Crociata, Washington, D.C., for Amicus Curiae American Casualty Company of Reading, PA, Supporting St. Paul Mercury Insurance Company. Vernon Priddy, III, Sands, Anderson, Marks & Miller, Richmond, Virginia; Daniel J. Cunningham, Kathleen A. Sweitzer, Tressler, Soderstrom, Maloney & Priess, Chicago, Illinois, for Amici Curiae Erie Insurance Company, Federal Insurance Company, and Great Northern Insurance Company, Supporting St. Paul Mercury Insurance Company.
Before KING and GREGORY, Circuit Judges, and HAMILTON, Senior Circuit Judge.
Affirmed in part and reversed in part by published opinion. Judge GREGORY wrote the opinion, in which Judge KING and Senior Judge HAMILTON joined.
OPINION
GREGORY, Circuit Judge:

1
On March 8, 2002, Cohen & Malad, LLP, an Indiana limited partnership, sued Resource Bankshares Corporation and Resource Bank ("Resource") in Indiana state court on behalf of a class of recipients of Resource's faxes. The lawsuit was based on the private right of action provided by the Telephone Consumer Protection Act, 47 U.S.C. § 227 (2003) ("TCPA"). During the times relevant to the lawsuit, Resource had a series of materially identical one-year general commercial liability insurance policies with St. Paul Mercury Insurance Company ("St.Paul"). Resource sought a declaration in the United States District Court for the Eastern District of Virginia that the class-action suit triggered coverage under two separate provisions of the policies. On cross-motions for summary judgment, the district court found that one of the two provisions mandated a duty to defend. We hold that the policies do not compel St. Paul to defend Resource for the class-action suit, and thus affirm in part and reverse in part the decision of the district court.

I.

2
The TCPA prohibits, among other things like the use of certain automated telephone equipment for telemarketing, the use of "any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." Id. § 227(b)(1)(C). Section 227(b)(3) creates a private right of action so recipients of such faxes can sue the senders. It provides that:

3
(1) A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State1

4
(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

5
(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

6
(C) both such actions.

7
If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

8

Id.

9
The Indiana class-action complaint alleged that Resource violated the TCPA by engaging in the mass transmission of unsolicited fax advertisements over a period of four years to an unknown class of recipients, numbering at least 40. Consistent with the straightforward and content-free nature of the TCPA, beyond simply noting that the faxes were advertisements, the class-action complaint never claimed that the faxes' content injured anyone (by, for example, claiming that the fax libeled them, divulged a trade secret, or infringed on a trademark). Rather, the complaint indicated that the mere receipt of the ads was harmful.2

10
The insurance policies at issue, written in admirably plain English, contain two relevant provisions: one describing the coverage for "property damage" caused by an "event" and one for damages resulting from an "advertising injury offense." The property-damage provision states that St. Paul will "pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage," J.A. 41, and explains that:

Property damage means:

11
• physical damage to tangible property of others, including all resulting loss of use of that property; or

12
• loss of use of tangible property of others that isn't physically damaged.

13
J.A. 42. To trigger coverage under this provision, any property damage must flow from an "event," which the policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." J.A. 42 (emphasis added).

14
As for the "advertising injury" provision, the policies state that:

15
We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:

16
• results from the advertising of your products, work, or completed work; and

17
• is caused by an advertising injury offense committed while this agreement is in effect.

18
J.A. 43. The limitation to "advertising injury offense" means that coverage extends only to damages arising from the following offenses:

19
• Libel or slander.

20
• Making known to any person or organization written or spoken material that disparages the products, work, or completed work of others.

21
• Making known to any person or organization written or spoken material that violates a person's right of privacy.

22
• Unauthorized use of any advertising idea, material, slogan, style, or title of others in your advertising.

23
J.A. 43 (emphasis added). The third-listed offense — "making known to any person or organization written or spoken material that violates a person's right of privacy" — is chiefly at issue here.

24
Resource notified St. Paul of the suit and claimed coverage, which, on June 4, 2002, St. Paul denied. On August 7, 2002, a district court in North Carolina issued an opinion styled Prime TV, LLC v. Travelers Ins. Co., 223 F.Supp.2d 744 (M.D.N.C.2002). Prime TV held that, under North Carolina law, both the "property damage" and "advertising injury" sections of the insurance policy in that case mandated coverage for a suit alleging a TCPA violation. In June of the next year Resource told St. Paul of the Prime TV case and argued that the policy was materially identical to St. Paul's. St. Paul again denied that the policies entitled Resource to coverage. Then, on November 4, 2003, Resource brought this declaratory judgment action. Resource seeks a declaration that St. Paul must defend, indemnify, and reimburse Resource for all costs associated with the class-action litigation.

25
The parties filed cross-motions for summary judgment. Recognizing that courts of several other jurisdictions had already held for insureds seeking coverage for defense of TCPA suits under generally similar policies,3 the district court held that the "property damage" provision was inapplicable because Resource's conduct was not an "accident," J.A. 81-84, but found that the advertising injury offense provision applied because the faxes violated the recipient's "right to privacy." J.A. 74-80. Both parties appeal the judgments unfavorable to them.

II.

26
We review de novo a grant of summary judgment, Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 419 (4th Cir.2004), which is to be given when no genuine issue of material fact remains for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper "[u]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249, 106 S.Ct. 2505 (citations omitted).

27
A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Am. Online, Inc. v. St. Paul Mercury Ins. Co., 347 F.3d 89, 92 (4th Cir.2003). This appeal arises from a complaint filed in the Eastern District of Virginia, so we look to Virginia's choice-of-law rules. "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." Seabulk Offshore, 377 F.3d at 419; Buchanan v. Doe, 246 Va. 67, 431 S.E.2d 289, 291 (1993) ("generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage."). Since the policies were delivered to Resource in Virginia, the parties correctly agree that Virginia law governs.

28
"Under Virginia law, an insurer's obligation to defend an action `depends on comparison of the policy language with the underlying complaint to determine whether the claims alleged [in the complaint] are covered by the policy.'" Am. Online, 347 F.3d at 93 (quoting Superformance Int'l, Inc. v. Hartford Cas. Ins. Co., 332 F.3d 215, 220 (4th Cir.2003)); see Erie Ins. Exch. v. State Farm Mut. Auto. Ins. Co., 60 Va. Cir. 418, 423 (Va. Cir. Ct.2002) (courts apply the "eight corners rule," comparing the four corners of the policy with the four corners of the complaint). A policyholder bears the burden of proving that the policyholder's conduct is covered by the policy. See Furrow v. State Farm Mut. Auto. Ins. Co., 237 Va. 77, 375 S.E.2d 738, 740 (1989) (citing Md. Cas. Co. v. Cole, 156 Va. 707, 158 S.E. 873, 876 (1931)). Yet this burden is not especially onerous since the insurer must defend unless "it clearly appears from the initial pleading the insurer would not be liable under the policy contract for any judgment based upon the allegations." Reisen v. Aetna Life and Cas. Co., 225 Va. 327, 302 S.E.2d 529, 531 (1983) (citing Travelers Indem. Co. v. Obenshain, 219 Va. 44, 245 S.E.2d 247, 249 (1978)). The duty to defend is broader than the duty to indemnify because it "arises whenever the complaint alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy." Brenner v. Lawyers Title Ins. Corp., 240 Va. 185, 397 S.E.2d 100, 102 (1990); Reisen, 302 S.E.2d at 531. "However, if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations, `it has no duty even to defend.'" Brenner at 102 (quoting Obenshain, 245 S.E.2d at 249).

29
In Virginia "an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts." Seabulk Offshore, Ltd., 377 F.3d at 419 (citing Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 240 Va. 457, 397 S.E.2d 876, 877 (1990)). As with other contracts, when interpreting a policy courts must not strain to find ambiguities, see, e.g., Salzi v. Virginia Farm Bureau Mut. Ins. Co., 263 Va. 52, 556 S.E.2d 758, 760 (2002) ("`[A]s in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction.'") (quoting Graphic Arts, 397 S.E.2d at 877), or examine certain specific words or provisions in a vacuum, apart from the policy as a whole. See, e.g., TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C., 263 Va. 116, 557 S.E.2d 199 (2002); First Am. Title Ins. Co. v. Seaboard Sav. & Loan Ass'n, 227 Va. 379, 315 S.E.2d 842, 845 (1984). A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning. See Caldwell v. Transp. Ins. Co., 234 Va. 639, 364 S.E.2d 1, 3 (1988) (citing St. Paul Ins. v. Nusbaum & Co., 227 Va. 407, 316 S.E.2d 734 (1984)).

30
Because insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear. Accordingly, if an ambiguity exists, it must be construed against the insurer. See, e.g., Craig v. Dye, 259 Va. 533, 526 S.E.2d 9 (2000); Caldwell, 364 S.E.2d at 3; Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co., 148 Va. 829, 139 S.E. 513, 517 (1927) ("It is a well recognized rule that insurance policies, in case of doubt, should be construed most strongly against the insurer. But this does not authorize the court to make a new contract for the parties, nor to adopt a construction not justified by the language or intent of the parties.").

III.

31
For the following reasons, we hold that neither the "property damage" nor the "advertising injury" provision covers the class-action lawsuit. St. Paul thus owes Resource no duty to defend the suit.

A.

32
As the policy language quoted above makes plain, Resource is entitled to coverage for "property damage" liability only for actions that are reasonably termed an "accident."4 What can be called an "accident" has, at times, been a puzzling question.5 Yet often, as here, the answer is clear enough.

33
To decide whether something is an accident under an insurance policy, Virginia courts ask whether an event was a natural and probable consequence of the insured's intended actions. Under this formulation, an accident "is an event which creates an effect which is not the natural or probable consequence of the means employed and is not intended, designed, or reasonably anticipated." Lynchburg Foundry Co. v. Irvin, 178 Va. 265, 16 S.E.2d 646, 648 (1941); see also Citizens Home Ins. Co., Inc. v. Nelson, 218 Va. 216, 237 S.E.2d 100, 102 (1977) (same). Stated otherwise, the question is whether the incident or injury was a reasonably foreseeable result of the insured's actions. See, e.g., Patch v. Metro. Life Ins. Co., 733 F.2d 302, 304 (4th Cir.1984) (noting that the crucial inquiry in the "natural or probable consequence" test is the "forseeability of consequences and not intent of the insured"); Utica Mut. Ins. Co. v. Travelers Indem. Co., 223 Va. 145, 286 S.E.2d 225, 226 (1982) (accident is an "incident unexpected from the viewpoint of the insured"; intentional actions are not accidents); Smith v. Combined Ins. Co. of Am., 202 Va. 758, 120 S.E.2d 267, 268 (1961) (insured who resisted arrest, wounded a police officer, and took refuge in a building that was set on fire by police tear gas bombs was not entitled to benefits from accidental-death policy because his death was a reasonably foreseeable consequence of his actions); Ocean Accident & Guarantee Corp. v. Glover, 165 Va. 283, 182 S.E. 221, 222 (1935) (adopting a common-language dictionary definition of "accident"); Baker v. Va. Employment Comm'n, 1998 WL 972284 (Va. Cir. Ct.1998) (an accident "is a befalling; an event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; a mishap resulting in injury to a person or thing.") (citing Derby v. Swift & Co., 188 Va. 336, 49 S.E.2d 417 (1948)).

34
Resource does not deny that it intentionally sent advertisements by fax. Rather, as we understand it, Resource submits the possibility that it only intended to fax ads to recipients who actually wanted them, and only did otherwise inadvertently. In other words, Resource suggests that it could not foresee that the faxes were unsolicited. In support of the claim that a TCPA violation could be an accident, Resource cites Park University Enterprises, Inc. v. American Casualty Co. of Reading, PA., 314 F.Supp.2d 1094 (D.Kan.2004). Resource also cites several cases from other contexts (although none from the Virginia Supreme Court) which could all be called "mistaken identity means accidental action." These cases basically hold that various actions which are not necessarily injurious when consent exists can be an accident under insurance law when they are mistakenly performed on an un consenting party. See, e.g., York Indus. Ctr., Inc. v. Mich. Mut. Liab. Co., 271 N.C. 158, 155 S.E.2d 501 (1967) (under North Carolina law, insured who intentionally cut down a neighbor's trees in the mistaken belief that they were on the insured's property was covered by accident insurance); Erie Ins. Exchange v. Sipos, 64 Va. Cir. 55 (Va. Cir. Ct.2004) (insured who disposed of property from an apartment under the mistaken belief that it was unwanted debris when it really belonged to a new tenant was entitled to coverage because action was an accident).6

35
Resource's "accidental fax" argument does not persuade us. The TCPA prohibits all unsolicited advertisements sent by fax. Specifically, the TCPA defines the term by noting that "[t]he term `unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4) (2003) (emphasis added). Here lies the problem: Resource has offered precisely no evidence that would cause a reasonable person to mistakenly believe that they had received prior express consent to send their fax ads.

36
Without such evidence, Resource cannot begin to carry its burden, see Furrow, 375 S.E.2d at 740, of establishing that its conduct potentially merits coverage, even though at this stage in the proceedings all that it needs to prove is that a reasonable jury could find as much, see Anderson v. Liberty Lobby, 477 U.S. at 249, 106 S.Ct. 2505 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (citations omitted)). As Anderson explained, "a party opposing a properly supported motion for summary judgment `may not rest upon the mere allegations or denials of his pleading, but... must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 248, 106 S.Ct. 2505 (quoting Fed. R.Civ.P. 56(e)) (emphasis added). Thus, while Resource disputes the forseeability of its consequences, this dispute is not a genuine one under the summary judgment standards and, unlike Universal Underwriters, 401 F.3d at 882, the forseeability of Resource's conduct is not "an open factual question," id. Because Resource plainly (1) intended to transmit the faxes to someone, and (2) fails to present evidence that could reasonably be mistaken as express permission to send these faxes, we can only conclude that the sending was not accidental. It is obvious to anyone familiar with a modern office that receipt is a "natural or probable consequence" of sending a fax, and receipt alone occasions the very property damage the TCPA was written to address: depletion of the recipient's time, toner, and paper, and occupation of the fax machine and phone line. In this way we fully agree with the Seventh Circuit's opinion on this issue in American States Ins. Co., 392 F.3d 939, 943 (7th Cir.2004), which explained that:

37
junk faxes use up the recipient's ink and paper, but senders anticipate that consequence. Senders may be uncertain whether particular faxes violate § 227(b)(1)(C) but all senders know exactly how faxes deplete recipients' consumables.... Because every junk fax invades the recipient's property interest in consumables, this normal outcome is not covered.

38
Id.; see also W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co., 269 F.Supp.2d 836 (N.D.Tex. 2003). Accordingly, we affirm the district court's grant of summary judgment to St. Paul on the "property damage" provision.

B.

39
Resource's other claim is based exclusively on the third prong of the advertising-injury offense part of the policies: "making known to any person or organization written or spoken material that violates a person's right to privacy." J.A. 43.

40
We first note that neither the class-action complaint nor the TCPA's private right of action ever actually mentions the word "privacy." See J.A. 14-19. Rather, the district court held that the complaint implied an allegation of a right-to-privacy violation.7 We can grant to Resource that the harm occasioned by unsolicited faxes involves protection of some sort of "privacy." Junk faxes cause some economic damage (each instance may be small but is nonetheless real, and the amount becomes especially serious when aggregated) and what might be called some kind of harm to privacy (in the same sense that certain nuisances invade privacy). The TCPA's private right of action obviously meant to remedy and prevent these twin harms, so the class-action complaint could imply some sort of "privacy" concern.8 But the word privacy carries different meanings in different contexts,9 and if any overlap exists between the complaint's "implied privacy" and the policies' explicit use of the word it is only nominal (both in the sense that it is in name only and that it is trivial). But, contrary to Resource's contentions, this nominal overlap does not necessarily result in ambiguity. Every word in this sentence contains different meanings, but all read clearly in context.

41
The real question, then, is whether, when read in context, a reasonable purchaser of insurance would believe that the sort of privacy interests protected by the policies overlap with the sort of privacy with which the TCPA is concerned. See American States, 392 F.3d at 942 ("To say, as the district court did, that § 227(b)(1)(C) protects privacy, and then stop the analysis, is to avoid the central question in the case: whether the policies cover the sort of seclusion interests affected by faxed ads."). In American States the Seventh Circuit adeptly analyzed the two types of "privacy" really at issue in insurance coverage disputes for TCPA lawsuits. We approve of its analysis, and hold that the St. Paul policies do not cover the sorts of privacy invasions envisioned by the TCPA's unsolicited fax prohibition. As Judge Easterbrook explained:

42
"Privacy" is a word with many connotations. The two principal meanings are secrecy and seclusion, each of which has multiple shadings. See Restatement (Second) of Torts § 652 (1977); Richard S. Murphy, Property Rights as Personal Information, 84 Geo. L.J. 2381 (1996). A person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion. Some other uses of the word "privacy" combine these senses: for example, a claim of a right to engage in consensual sexual relations with a person of the same sex, or to abort an unwanted pregnancy, has both informational (secrecy) and locational (seclusion) components, with an overlay of substance (the objection to governmental regulation).

43
American States, 392 F.3d at 941. This passage puts words to the gut instinct one feels when comparing the class-action complaint with St. Paul's policies: if the class-action complaint alleges any violation of privacy, it is "seclusion" privacy. It is concerned with the manner of the advertisement. In contrast, the advertising-injury offense part of the policies is exclusively concerned with those types of privacy, see Prosser, supra n. 9, which, like secrecy, are implicated by content of the advertisements.

44
Consider closely the text and context of the operative sentence. It states that coverage exists for advertisements "making known to any person or organization written or spoken material that violates a person's right to privacy." J.A. 43 (emphasis added). It requires undue strain to believe that sending an unsolicited fax ad that has no private information or content (but rather simply advertised fairly the sender's wares) can reasonably be said to "mak[e] known" material that violates a person's10 right to privacy. It surely seems to us that the plainest and most common reading of the phrase indicates that "making known" implies telling, sharing or otherwise divulging, such that the injured party is the one whose private material is made known, not the one to whom the material is made known.

45
But this alone is not the key to the case; applying the commonsense canon of construction compelling courts to look to the immediate context of a word or phrase for interpretive guidance gets to the heart of the matter. As noted above, the policies promise to pay for damages from injuries arising from:

46
• Libel or slander

47
• Making known to any person or organization written or spoken material that disparages the products, work, or completed work of others.

48
• Making known to any person or organization written or spoken material that violates a person's right to privacy.

49
• Unauthorized use of any advertising idea, material, slogan, style, or title of others in your advertising.

50
J.A. 43. First, the meaning of "making known" in the third-listed offense is also informed by its next-door neighbor, which provides coverage for making known disparaging material. It is difficult to imagine how "making known" disparaging material harms the recipient of the material. Rather, it is clear to us that both of these "making known" provisions focus on harm to a third party. Moreover, these four offenses all share the common thread of assuming that the victim of the advertising injury offense is harmed by the sharing of the content of the ad, not the mere receipt of the advertisement. See, e.g., Select Design, Ltd. v. Union Mut. Fire Ins. Co., 165 Vt. 69, 674 A.2d 798, 802 (1996) ("The term `advertising injury,' as ... construed in an overwhelming majority of reported cases, is injury to another that results from the content of statements about the products or services of the insured.").

51
But broadly prohibiting junk fax ads has nothing at all to do with the content of any ads. For example: a single, unsolicited page with nothing but a three-word slogan (perhaps "Refinance with Resource" or "Just Do It") or even a name or an abstract squiggle alone — if it can be construed as an ad (say, "Nike," or its famous "Swoosh" trademark) — violates the TCPA and triggers the private right of action. However, a solicited ad that somehow manages to simultaneously defame, libel, tell trade secrets, and infringe ten trademarks, may incur lots of legal liability but is in no way prohibited by the TCPA.

52
In contrast, however, we see quite easily how the TCPA might facilitate interstate commerce by allowing owners of fax machines sufficient seclusion to do with their fax-dedicated phone line and fax machine as they wished without sifting through stacks of unwanted faxes that deplete their paper and toner. In our view, then, the TCPA's unsolicited fax prohibition provides one small bit of sanctuary from certain solicitations, but does not even hint at protecting anyone from private facts being divulged through an advertisement (which, of course, the policies plainly do). Accordingly, the privacy prong of the advertising injury provision cannot be construed to cover a violation of the TCPA.

53
One does not have to look far to find how a policy could have been written differently in order to secure coverage for TCPA violations. After oral argument in this case, the Eighth Circuit decided Universal Underwriters, 401 F.3d 876, which Resource claims aids them. In Universal Underwriters, the policy at issue promised to pay all damages arising from, among other things, "private nuisance (except pollution), [and] invasion of rights of privacy..." and did not limit or qualify these terms. Id. at 881. An unwanted fax is a paradigmatic private nuisance, and we think the "invasion of rights of privacy" provision's proximity to the private nuisance language, but separation from "advertising injury," surely had to influence the Eighth Circuit's reasoning. Indeed, Universal Underwriters took care to distinguish American States, 392 F.3d 939, where, like this case, the privacy provision was embedded in an advertising injury part. See Universal Underwriters, 401 F.3d at 882-83.

54
The point is that context matters, and here, like American States and unlike Universal Underwriters, the context points against coverage. We must therefore reverse the ruling of the district court finding that the privacy clause imposes a duty to defend Resource.

IV.

55
To sum up: simply sending a fax is what causes the property damage protected by the TCPA and alleged in the class-action lawsuit, and Resource presented us with no evidence that it sent its faxes accidentally. It thus cannot avoid summary judgment on the point that the "property damage" provision provides no coverage for the class-action lawsuit. Moreover, the TCPA's unsolicited fax prohibition protects "seclusion" privacy, for which content is irrelevant. Unfortunately for Resource, it did not buy insurance policies for seclusion damages; instead, it insured against, among other things, damages arising from violations of content-based privacy. This reasonable, non-technical distinction precludes coverage for an "advertising injury offense." For the foregoing reasons, we remand to the district court in order to grant St. Paul's motions for summary judgment and deny Resource's pursuant with this opinion. The judgment of the district court is thus

56

AFFIRMED IN PART AND REVERSED IN PART.

Notes:

1
We have previously interpreted this portion of the statute to mean that state courts have exclusive jurisdiction for private TCPA actionsSee Int'l Sci. & Tech. Inst., Inc. v. Inacom Comm., Inc., 106 F.3d 1146 (4th Cir.1997).

2
In this regard, the complaint stated:

3
With regard to fax advertising in particular, the United States Congress recognized that the proliferation of facsimile machines had been accompanied by explosive growth in unsolicited facsimile advertising, or `junk faxes.'

4
Congress further noted that fax advertisers took advantage of fax machines by sending advertisements to available fax numbers, knowing the fax would be received and printed by the recipient's machine. Congress found this practice problematic for two (2) reasons: (i) it shifts some of the costs of advertising from the sender to the recipient; and (ii) it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk faxes
J.A. 14-15.

3
See Park Univ. Enter., Inc. v. Am. Cas. Co. of Reading, PA, 314 F.Supp.2d 1094 (D.Kan. Apr. 15, 2004); Registry Dallas Assocs. v. Wausau Bus. Ins. Co., 2004 WL 614836 (N.D.Tex. Feb.26, 2004); Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 300 F.Supp.2d 888 (E.D.Mo.2004), aff'd, 401 F.3d 876 (8th Cir.2005); Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc., 2003 WL 23278656 (S.D.Ill.Dec.9, 2003) (advertising injury provision mandates coverage), rev'd, 392 F.3d 939 (7th Cir.2004); Hooters of Augusta, Inc. v. Am. Global Ins. Co., 272 F.Supp.2d 1365 (S.D.Ga.2003); W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co., 269 F.Supp.2d 836 (N.D.Tex.2003); Prime TV, 223 F.Supp.2d 744; TIG Ins. Co. v. Dallas Basketball, Ltd., 129 S.W.3d 232 (Tx.Ct.App. Feb. 25, 2004); Merchant's & Businessmen's Mut. Ins. Co. v. A.P.O. Health Co., Inc., 228 N.Y. L.J. 22 (N.Y.Sup.Ct. Aug. 29, 2002).

4
St. Paul also contends that no "property damage" was ever implicated by the class-action lawsuit. Because a separate fatal flaw exists in Resource's property-damage claim — the fact that sending the faxes was not an "accident" — the district court did not address this question, and neither do we

5
As one court wrote,
Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.
Brenneman v. St. Paul Fire & Marine Ins. Co., 411 Pa. 409, 192 A.2d 745, 747 (1963); see also Aetna Ins. Co. v. Carpenter, 170 Va. 312, 196 S.E. 641, 646 (1938) ("The word `accidental' is not easy to define in specific legal terms applicable to every case."); see generally Adam F. Scales, Man, God, and the Serbonian Bog: the Evolution of Accidental Death Insurance, 86 Iowa L.Rev. 173 (2000) (explaining the longstanding difficulties faced in deciding whether a death was "accidental" and proposing a solution).

6
Resource also claims a case from this court,Atlantic Permanent Federal Savings & Loan Association v. American Casualty Co., 839 F.2d 212 (4th Cir.1998), for the proposition that "Virginia courts have never extended the `intentional wrongdoing' defense to conduct which, though itself `intentional,' was not intended to cause injury." Id. at 217. We pause to note Atlantic Permanent's inapplicability to this context. This quote is plucked from a section dealing with an argument regarding whether Virginia's public policy prohibited issuing insurance policies for actions which, while intentionally done, were not intended to cause injury. See id. That we earlier noted that Virginia law did not affirmatively make such actions uninsurable is entirely different from saying that this type of policy — one covering accidents — actually covers the conduct at issue in this case.

7
St. Paul argues that since the complaint did not explicitly allege a violation of the right to privacy — indeed, that the word "privacy" was nowhere mentioned within the four corners of the complaint — this should end the case. This may or may not be right, but because we are not certain that the Virginia Supreme Court would categorically rule out a claim that was not explicit if it was somehow implicit in the text and because the matter can be resolved on another perfectly good reason, we refrain from deciding the matter and thus assume arguendo that an implied privacy allegation could be sufficient

8
We do not, however, grant this based on Resource's citation of our decision inInternational Science & Technology Institute, Inc., 106 F.3d 1146 (4th Cir.1997). That decision contained dictum stating that "[t]he TCPA was enacted to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers." Id. at 1150 (citing S.Rep. No. 102-178, at 1 (1991)). Resource claims that this helps to prove their point that the private right of action was passed to protect "privacy," and this citation is typical of their legislative history argument. We pause to clarify International Science & Technology Institute's application in this case. Besides being pure dictum, it does not aid Resource's argument because, if anything, it only indicates that the TCPA had two broad reasons for being: (1) privacy for home-phone users, and (2) facilitation of interstate commerce for fax users. But, as we explain, St. Paul cannot get off so easily either: interstate commerce can surely be facilitated by some species of the genus "privacy" — here, the seclusion species. See Prosser, infra n.10. This simply means that we must decide whether St. Paul's policies protect liability arising from violations of "seclusion" privacy. See American States, 392 F.3d at 942.

9
This is no new revelation. The path-breaking scholarship on "privacy" in the law was written well over a hundred years ago by Samuel D. Warren and Justice Brandeis,see The Right to Privacy, 4 Harv. L.Rev. 193 (1890) (collecting cases in which relief had been afforded on the basis of, e.g., defamation, a breach of confidence, or the invasion of some property right and grouping them together as a "right to privacy"). These disparate strands were carefully teased out, defined, and clarified by Dean Prosser some 45 years ago. See William L. Prosser, Privacy, 48 Cal. L.Rev. 383 (1960). Prosser found four separate privacy-related torts: "1. Intrusion on the plaintiff's seclusion or solitude, or into his private affairs. 2. Public disclosure of embarrassing private facts about the plaintiff. 3. Publicity which places the plaintiff in a false light in the public eye. 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness." Id. at 389. For a more recent treatment, see, e.g., Jerry Kang, Privacy in Cyberspace, 50 Stan. L.Rev. 1193, 1202-04 (1998) (finding three distinct categories of privacy interests: (1) physical space, such as that violated by trespass and unwarranted search and seizure; (2) decisional privacy, as discussed in Roe v. Wade; and (3) informational privacy, or "control over the processing — i.e., the acquisition, disclosure, and use — of personal information.").

10
St. Paul also makes the argument that "person" here means "human" person, not "legal" person or "organization" (which would include a LLP). St. Paul Br. at 29-34. St. Paul puts too fine a point on things here. But more fundamentally, as Resource argues, since this is a class-action complaint with unnamed parties, it is fair to assume that at least some of class members could be "persons" even in the restrictive sense that St. Paul suggests