**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 10-1530**

─────────

BRETON, LLC; HEMAN WARD, INCORPORATED; B&H MANAGEMENT COMPANY,

              Plaintiffs - Appellees,

       v.

GRAPHIC ARTS MUTUAL INSURANCE COMPANY, d/b/a Utica National Insurance Group,

              Defendant – Appellant,

       and

JEFFERSON-PILOT LIFE INSURANCE COMPANY, Merged with the Lincoln National Life Insurance Company,

              Defendant.

─────────

**No. 10-1571**

─────────

BRETON, LLC; HEMAN WARD, INCORPORATED; B&H MANAGEMENT COMPANY,

              Plaintiffs - Appellants,

       v.

GRAPHIC ARTS MUTUAL INSURANCE COMPANY, d/b/a Utica National Insurance Group,

              Defendant – Appellee,

and

JEFFERSON-PILOT LIFE INSURANCE COMPANY, Merged with the Lincoln National Life Insurance Company,

Defendant.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:09-cv-00060-AJT-TRJ)

---

Argued: May 12, 2011                    Decided: September 6, 2011

---

Before KING, SHEDD, and WYNN, Circuit Judges.

---

Reversed and remanded by unpublished opinion. Judge Wynn wrote the majority opinion, in which Judge King joined. Judge Shedd wrote a concurring opinion.

---

**ARGUED:** Lon Arthur Berk, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellant/Cross-Appellees. Charles Thomas Brown, SILVER & BROWN, Fairfax, Virginia, for Appellee/Cross-Appellants. **ON BRIEF:** Brian J. Gerling, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellant/Cross-Appellees. Glenn H. Silver, SILVER & BROWN, Fairfax, Virginia, for Appellee/Cross-Appellants.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After a fire damaged its warehouse, Plaintiff Breton, LLC ("Breton")[1] sought a declaratory judgment that it was entitled to coverage under an insurance policy issued by Graphic Arts Mutual Insurance Co. ("Graphic Arts"). Breton also asserted that Graphic Arts breached the insurance contract by denying coverage. Graphic Arts responded that it was not obligated to provide coverage in part due to the operation of an exclusion from coverage in the policy's Protective Safeguards endorsement. Because the operation of that exclusion hinges on an unresolved factual dispute, we reverse the district court's grant of summary judgment in favor of Breton and remand for further proceedings.

I.

On April 1, 2002, Graphic Arts issued Breton a commercial insurance policy providing coverage for, *inter alia*, fire damage to Breton's warehouse ("the warehouse"). The

---

[1] Appellees include Breton, LLC, Heman Ward, Inc., and B&H Management Company. For ease of reading, we will refer to these parties collectively as "Breton."

3

policy, which was renewed through April 1, 2008, includes a Protective Safeguards endorsement stating that, "[a]s a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above." J.A. 1871.[2] The only protective device or service referenced in the Schedule is an Automatic Sprinkler System.[3] The endorsement also contains an exclusion stating, "[Graphic Arts] will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you . . . [f]ailed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." J.A. 1871. Additionally, the policy has a Transfer of Rights and Duties provision stating, "[Breton's] rights and duties under this policy may not be transferred without [Graphic Arts'] written consent except in the case of death of an individual named insured." J.A. 1868.

_____

[2] Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

[3] The policy defines an Automatic Sprinkler System as:
  (1) Any automatic fire protective or extinguishing system, including connected:
        (a) Sprinklers and discharge nozzles;
        (b) Ducts, pipes, valves and fittings;
        (c) Tanks, their component parts and supports; and
        (d) Pumps and private fire protection mains.
  (2) When supplied from an automatic fire protection system:
        (a) Non-automatic fire protective systems; and
        (b) Hydrants, standpipes and outlets.
  J.A. 1871.

4

On December 1, 2004, Breton leased the warehouse to Joe Ragan's Coffee, Ltd. ("Ragan").[4] The lease contract stated in part:

> Tenant at its expense shall at all times maintain said Premises in good condition and repair, including all mechanical, plumbing, and electrical equipment and also in a clean, sanitary and safe condition in accordance with all directions, rules, and regulations of the . . . fire marshal . . . .

J.A. 1002.

On December 2, 2007, a fire destroyed the warehouse. An investigation by the local fire department revealed that the valve controlling the supply of water to the sprinkler heads was in the closed position, rendering the Automatic Sprinkler System inoperable. Based on this discovery, Graphic Arts asserted that Breton failed to maintain an Automatic Sprinkler System as required by the policy. Alternatively, Graphic Arts contended that insofar as Breton delegated the obligation to maintain the sprinkler system to Ragan, this delegation violated the insurance contract and barred coverage. On those bases, Graphic Arts denied coverage.

On January 21, 2009, Breton filed suit in the Eastern District of Virginia seeking a declaratory judgment that Graphic

---

[4] Prior to this lease agreement with Ragan, Breton leased the warehouse to Alexandria Packaging & Supply Company ("Alexandria Packaging"). Graphic Arts had knowledge of both rentals.

5

Arts was obligated to provide coverage under the policy. Breton further alleged that Graphic Arts' failure to provide coverage constituted a breach of the insurance contract. Graphic Arts responded that Breton's failure to maintain an operable sprinkler system in the warehouse constituted a failure to satisfy a condition placed on coverage and triggered an exclusion from coverage. Graphic Arts argued in the alternative that Breton's breach of the insurance contract's Transfer of Rights and Duties provision justified denying coverage. Graphic Arts accordingly sought a declaratory judgment that coverage was barred. On August 5, 2009, the parties filed cross-motions for summary judgment.

After a hearing, the district court granted Breton's motion for summary judgment on November 10, 2009. First, the district court held that Breton satisfied the condition precedent to coverage included in the Protective Safeguards endorsement. The district court concluded that the word "maintain" as used in the condition was ambiguous because it has more than one definition that could reasonably apply in the context of the insurance policy. The district court interpreted the ambiguous term in a manner favoring coverage, concluding that "maintain" meant "to keep in existence." J.A. 2766. Because there was no dispute that Breton kept an Automatic Sprinkler System in existence in the warehouse, the court held

6

that Breton had demonstrated satisfaction of the condition precedent to coverage.

Next, the district court concluded that the exclusion did not apply to bar coverage. The district court found the word "control" as used in the exclusion to be ambiguous and again applied a definition effectuating coverage, ultimately interpreting "control" to mean "physical control." The district court reasoned that Breton did not have such "control" over the sprinkler system because it lacked "physical dominion over it or unfettered access to it." J.A. 2770. Because the requirement to keep the sprinkler system in "complete working order" was conditioned on Breton's having physical control over the system, the district court held that the exclusion was inapplicable.

Finally, the district court held that Breton did not violate the Transfer of Rights and Duties provision because Breton did not transfer its duty to "maintain" the sprinkler system to Ragan. The court therefore held that Breton was entitled to coverage and that Graphic Arts breached the insurance contract by denying coverage. The court awarded damages, including the cost of replacing the warehouse and Breton's lost business income.

Graphic Arts appealed, contending that the district court misread the policy and repeating the argument that Breton's failure to "maintain" a sprinkler system in "complete

7

working order," or alternatively Breton's delegation of contractual duties to Ragan, barred coverage. Breton filed a cross-appeal, arguing that the district court incorrectly calculated the period of time for which Graphic Arts was liable for Breton's lost business income.

## II.

"[W]e review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the non-moving party." Lee v. York Cnty. Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Virginia law governs the issues raised on appeal because this suit was brought in the Eastern District of Virginia on the basis of the court's diversity jurisdiction and Graphic Arts delivered the insurance policy to Breton in Virginia. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941) (holding that a federal court exercising diversity jurisdiction must apply the choice of law principles of the State in which the federal court is located); Buchanan v.

8

<u>Doe</u>, 246 Va. 67, 70, 431 S.E.2d 289, 291 (1993) ("[T]he law of the place where a insurance contract is written and delivered controls issue as to its coverage.").

A.

Graphic Arts first contends that the district court erred in concluding that Breton satisfied a condition placed on coverage. Paragraph 1a of the Protective Safeguards Endorsement states: "[a]s a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above." J.A. 1871. Graphic Arts argues that "maintain" is unambiguous as used in the condition and should be interpreted as requiring Breton to "do something to determine whether the system operates." Opening Brief of Appellant at 22.

Under Virginia law, "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." <u>Hill v. State Farm Mut. Auto Ins.</u>, 237 Va. 148, 152, 375 S.E.2d 727, 729 (1989). If the policy language is unambiguous the court simply applies the terms as written. <u>State Farm Fire and Cas. Co. v. Walton</u>, 244 Va. 498, 502, 423 S.E.2d 188, 191 (1992).

However, when the language of an insurance contract is ambiguous the terms are construed against the insurer. <u>St. Paul</u>

9

Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984) ("Insurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it."); see also Mollenauer v. Nationwide Mut. Ins. Co., 214 Va. 131, 132, 198 S.E.2d 591, 592 (1973) (per curiam) ("Where an insurance policy is susceptible of two constructions, one of which would effectuate coverage and the other not, it is the court's duty to adopt that construction which will effectuate coverage."); Central Sur. & Ins. Corp. v. Elder, 204 Va. 192, 197, 129 S.E.2d 651, 655 (1963) ("[W]here the language of a policy is susceptible of two constructions, it is to be construed liberally in favor of the insured and strictly against the insurer."). We therefore must first determine whether the district court erred in ruling that the policy language constituting the condition precedent was ambiguous.

"Language is ambiguous when it may be understood in more than one way or when such language refers to two or more things at the same time." Salzi v. Virginia Farm Bureau Mut. Ins. Co., 263 Va. 52, 55-56, 556 S.E.2d 758, 760 (2002); but see TM Delmarva Power, LLC v. NCP of Va., LLC, 263 Va. 116, 119, 557

10

S.E.2d 199, 200 (2002) ("A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used."). "A term is unambiguous only if, within its context, it is not susceptible to more than one meaning." Gates, Hudson & Assoc., Inc., v. Fed. Ins. Co., 141 F.3d 500, 502 (4th Cir. 1997) (applying Virginia law).

In the present case, the word "maintain" "may be understood in more than one way," which supports a finding of ambiguity. Salzi, 263 Va. at 55-56, 556 S.E.2d at 760. Black's Law Dictionary defines "maintain" in relevant part as:

> 1. To continue (something).
> 2. To continue in possession of (property, etc.).
>    . . . .
> 4. To care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep.

Black's Law Dictionary 1039 (9th ed. 2009). Similarly, Webster's New World Dictionary provides multiple definitions for "maintain," including: "1. to keep or keep up; carry on 2. to keep in continuance or in a certain state, as of repair . . . 5. to support by supplying what is needed." Webster's New World Dictionary 363 (Warner Books ed. 1987). As the Supreme Court of Virginia has recognized, "the word 'maintain' has several meanings, each depending upon the context of the statement in which it is used." Savage v. Com. ex rel. State Corp. Comm'n, 186 Va. 1012, 1020, 45 S.E.2d 313, 317 (1947).

11

Nonetheless, Graphic Arts argues that the district court strained to find ambiguity when ignoring the "plain meaning" of "maintain" in the text of the contract. We disagree. As used in the insurance contract, "maintain" could be reasonably interpreted, as Graphic Arts contends, to refer to regular repair obligations with respect to the Automatic Sprinkler System. However, as the district court noted, the word could also be reasonably interpreted to refer to an obligation to continue to have an Automatic Sprinkler Sprinkler system in the warehouse. Absent any clarification in the policy, we conclude that "maintain" is ambiguous here.

This conclusion is supported by other provisions of the contract. We note that "maintain" is also used in an exclusion from coverage, which we discuss below. Rather than read the terms of the policy in isolation, we must look to other contract provisions that use a specific word to clarify its intended meaning. See Gates, 141 F.3d at 502-03. The exclusion expressly qualifies the word "maintain" with the words "in complete working order." As the district court recognized, interpreting "maintain" to require ensuring operability would render the "in complete working order" language in the exclusion superfluous. However, "no word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words

12

in the contract." TM Delmarva Power, 263 Va. at 119, 557 S.E.2d at 200.[5]

Moreover, Graphic Arts cannot point to any contract language defining the nature or degree of the obligations it contends stem from the duty to "maintain." For instance, there is no indication as to how frequently any purportedly required inspections must take place, what components of the system would need to be examined during an inspection, or how rapidly defects revealed during an inspection must be repaired. As the district court noted, "to impose implied duties on an insured through the vagaries of the word 'maintain'—such as the duty to access, inspect and repair a leased property—would necessarily require an insured to guess at what its duties and responsibilities are, something that Virginia law seeks to avoid when interpreting the language of an insurance policy." J.A. 2767-68.

In contrast, defining "maintain" as "to keep" would be more likely to effectuate coverage, as it would simply require the continued retention of an Automatic Sprinkler System in order to satisfy the condition precedent. Virginia law compels our application of this definition. Mollenauer, 214 Va. at 132, 198 S.E.2d at 592. Because it is undisputed that Breton kept an

---

[5] During oral argument, Graphic Arts argued that the use of "maintain" in the exclusion should not be used to inform the meaning of "maintain" in the condition placed on coverage.

13

Automatic Sprinkler System in place at all relevant times, we conclude that the district court did not err in finding that Breton satisfied the condition placed on coverage.

## B.

Next, Graphic Arts argues that Breton cannot enforce the insurance agreement because Breton breached the contract by violating the Transfer of Rights and Duties provision. We disagree. The provision states, "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." J.A. 1868. Graphic Arts contends that Breton violated this provision by leasing the warehouse to Ragan and, in the lease contract, obligating Ragan to "maintain [the warehouse] in good condition and repair." J.A. 1002. Because Graphic Arts never gave consent, written or otherwise, to a transfer of Breton's duties under the contract, Breton could not transfer its duty to maintain the warehouse to another. However that duty was not "transferred" when Breton's lease contract with Ragan also imposed a maintenance duty on the tenant. This is so for two reasons. First, even if Breton delegated its duty to maintain the sprinkler system to Ragan, Breton would still owe a maintenance duty to Graphic Arts. See Restatement (Second) of Contracts § 318 ("Unless the obligee agrees otherwise, neither

14

delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."). Second, the lease contract between Breton and Ragan created an independent maintenance duty owed by Ragan to Breton; it did not contemplate the transfer of a duty owed by Breton to Graphic Arts. In short, the fact that Ragan owed Breton a similar duty to that which Breton owed Graphic Arts does not mean that Breton transferred its duty under the insurance contract. Because Breton did not transfer its duties, we hold that the district court did not err in finding that Breton did not breach the contract's Transfer of Rights and Duties provision.

C.

Finally, Graphic Arts contends that an exclusion in the Protective Safeguards endorsement operates to bar coverage. The exclusion states "[Graphic Arts] will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you . . . [f]ailed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." J.A. 1871.

As explained above, if this language is unambiguous, the court's role is simply to apply the contract terms as written. Walton, 244 Va. at 502, 423 S.E.2d at 191. However,

15

the exclusion is qualified by the requirement that the insured "had control" over the protective safeguard in question. The district court opined that "control" could be understood to mean "legal control" or "physical control."

Black's Law Dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee . . . ." Black's Law Dictionary 378 (9th ed. 2009). Webster's New World Dictionary similarly defines "control" as "1. power to direct or regulate 2. a means of controlling; check 3. an apparatus to regulate a mechanism." Webster's New World Dictionary 137 (Warner Books ed. 1987). Given the similarity of these definitions, the word "control" would at first blush seem unambiguously to reference a power to manage, direct, or regulate an object or entity. Yet, as the district court noted, a reasonable distinction can be drawn between the physical power to regulate an object or entity and the legal power to do so.

In some instances, courts construe "control" as established through physical power over an object. For example, Virginia cases addressing whether one has "control" over a vehicle have equated the possession of keys to the vehicle with control of the vehicle. See Bell v. Commonwealth, 21 Va. App.

16

693, 699, 467 S.E.2d 289, 292 (1996) (holding that, for purposes of statute criminalizing theft of vehicle from victim who had "possession or control" of vehicle, victim's possession of the car keys was sufficient to support conviction); see also Burchette v. Commonwealth, 15 Va. App. 432, 435-36, 425 S.E.2d 81, 84 (1992) (reversing conviction based on constructive possession and noting lack of evidence that defendant had keys to vehicle in which contraband was found); but see Overbee v. Commonwealth, 227 Va. 238, 243, 315 S.E.2d. 242, 244 (1984) (for purpose of DUI statute, which requires driving or "operation" of vehicle, mere possession of vehicle's keys is not enough to establish "actual physical control" of the vehicle).[6]  Another example can be found in United States v. Buculei, 262 F.3d 322 (4th Cir. 2001), where we discussed whether a child was under the "control" of the defendant and rejected any argument that "control" required legal power over the child, instead concluding that the statute in question contemplated the

---

[6] This conception of keys indicating "control" of a vehicle is not unique to Virginia.  See United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir. 1991), cert. denied, 502 U.S. 1100 (1992) (deeming possession of vehicle's keys evidence of control over vehicle); United States v. Damsky, 740 F.2d 134, 139 (2d Cir.), cert. denied, 469 U.S. 918 (1984) (holding that defendant had dominion and control of vehicle once he was given the key thereto); United States v. Jackson, 529 F. Supp. 1047, 1050 (D. Md. 1981) (finding exclusive control over vehicle obtained upon possession of keys).

17

exercise of physical power over the child.  Id. at 331-33 (analyzing language of 18 U.S.C. § 2251A(b)(2)).

In contrast, even without physical control, one may have legal power over an object or entity (i.e. legal control). See Brock v. Hamad, 867 F.2d 804, 807 (4th Cir. 1989) (holding that, for purposes of Fair Labor Standards Act, defendant had "control" over multiple rental properties because "[a]ll the properties managed and controlled by the defendant were owned by the defendant, or by the defendant and his wife, or the defendant and his mother," and FLSA regulations defined control as existing "'where total ownership is vested in a single person, family unit, [or] partnership.'") (quoting 29 C.F.R. § 779.223 (1987)); see also Fitzpatrick v. United States, 410 F.2d 513, 516 n.3 (5th Cir. 1969) (noting that the lack of a "key *or ownership paper*" indicates lack of control) (emphasis added).

Indeed, courts have previously distinguished between the exercise of "physical control" and "legal control." See, e.g., United States v. Joshua, 607 F.3d 379, 387 (4th Cir. 2010) (noting, in the habeas corpus context, the distinction between physical and legal control when addressing custody determination); see also In re Video Depot, Ltd., 127 F.3d 1195, 1198 (9th Cir. 1997) ("Arlynn no longer had legal control over the funds, even if he retained physical control over them.").

18

As the foregoing discussion demonstrates, there are at least two interpretations of the word "control". Because interpreting "control" to mean either "physical control" or "legal control" would be reasonable in the context of the insurance contract at issue, we conclude that the term "control" is ambiguous here. See Salzi, 263 Va. at 55-56, 556 S.E.2d at 760. Again, when faced with an ambiguous contractual term, we must construe it liberally in favor of the insured. Elder, 204 Va. at 197, 129 S.E.2d at 655. Interpreting "control" to mean legal control would create more instances in which the exclusion could be triggered. As the district court observed, "one would expect fire insurance policies to be often issued, as in this case, to persons who own the insured property."[7] J.A. 2770. Consequently, if "control" meant "legal control," in many instances the exclusion would be triggered merely by the insured's ownership of the premises. By contrast, interpreting "control" to mean "physical control" would give greater effect to the qualification in the exclusion.[8] Accordingly, we will

---

[7] Indeed, to enter into a valid fire insurance contract, the insured must have a legal or equitable interest in the covered property. See Liverpool & London & Globe Ins. Co. v. Bolling, 176 Va. 182, 188-89, 10 S.E.2d 518, 520 (1940).

[8] Moreover, by construing "control" as meaning "physical control" we read the contract such that the insured is only required to perform duties which he is physically able to perform.

19

construe "control" as used in the exclusion to require the insured's physical control over the Automatic Sprinkler System.

To determine whether Breton had a contractual duty to maintain the Automatic Sprinkler System "in complete working order," it is necessary to determine whether Breton had physical control over the system. Whether or not Breton had physical control over the sprinkler system therefore constitutes a "material fact" necessary to the resolution of this case. See Anderson, 477 U.S. at 248. Because this material fact is in dispute, summary judgment is inappropriate. Fed. R. Civ. Pro. 56(a).

Importantly, all of the controls for the warehouse's Automatic Sprinkler System, including the water supply valve, were located within the warehouse in a Sprinkler Room. Breton argued that it did not have access to that room and therefore lacked physical control over the sprinkler system. Breton contended that before it leased the warehouse to Ragan, a former tenant, Alexandria Packaging, changed all of the locks in the warehouse and did not provide Breton with keys. According to Breton, when Ragan purchased the assets of Alexandria Packaging and leased the warehouse from Breton, Ragan received the keys from Alexandria. Breton asserts that Ragan then changed the

20

locks[9] and never gave Breton a copy of the keys, meaning that only Ragan had physical access to the Sprinkler Room. All told, Breton contends that during Alexandria Packaging's and Ragan's lease of the warehouse, Breton "had no access to the Sprinkler Room and had no control over the Sprinkler Room."[10] J.A. 711.

Graphic Arts, in contrast, asserts that Breton had control over the sprinkler system. Paul Graf, a corporate designee of Graphic Arts, testified that Breton "had control" because "it's their sprinkler system and they are in control of their own property." J.A. 1316. Graphic Arts also disputed Breton's contention that Ragan had sole control over the sprinkler system: "[I]t was disputed whether Joe Ragan or Breton had control of the sprinkler system." Response Brief of Cross Appellee at 12. Leona Ragan, a corporate designee of Joe Ragan Coffee, Ltd., testified that her company had neither the keys nor access to the Sprinkler Room.

We are unwilling to conclude, as did the district court, that Breton's lack of "unfettered access" to the

_____

[9] The record includes an invoice indicating that Baldino's Lock & Key charged Ragan for changing certain unidentified locks in the warehouse.

[10] It bears mention that during an insurance inspection prior to the fire, Breton's representative asserted that a contractor employed to work on the sprinkler system, rather than Ragan, had the keys to the Sprinkler Room.

21

Sprinkler Room meant that Breton lacked the requisite "physical control" over the Automatic Sprinkler System to trigger the duty to maintain the system "in complete working order." However, under our interpretation of the contract, if Breton was entirely unable to enter the warehouse to access the sprinkler system, then it had no such duty.

Here, the exclusion only obligated Breton to keep "in complete working order" those protective services or devices listed in the contract and "over which [Breton] had [physical] control." The only protective device or service listed was the Automatic Sprinkler System. The qualification "and over which you had control," must, to be given any effect, operate to distinguish between protective devices or services with respect to which Breton had a duty and those devices or services with respect to which no such duty existed. See Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983) ("Where possible, meaning must be given to every clause [in a contract]."). Since only one device was listed in the contract, the distinction contemplates Breton's loss of control over the sprinkler system and further permits such a loss of control to absolve Breton of a duty to maintain the sprinkler system "in complete working order." If Graphic Arts wanted to protect against this possibility, it could have easily included language obligating the insured to retain physical control over the sprinkler

22

system. It did not do so, and we will not construe the resulting contractual ambiguity to the detriment of Breton.

In light of the competing factual assertions regarding Breton's ability to access the Automatic Sprinkler System, we cannot agree with the district court that as a matter of law the exclusion was not triggered. Until the resolution of this material factual dispute, summary judgment is inappropriate.

## III.

In moving for summary judgment, Breton failed to establish that there were no genuine disputes of material fact. As such, the district court erred when granting summary judgment in favor of Breton. Accordingly, we reverse and remand for further proceedings.[11]

REVERSED AND REMANDED

---

[11] On cross-appeal, Breton challenges the district court's calculation of damages awarded for the breach of contract by Graphic Arts. Because we reverse the grant of summary judgment, we need not address this argument.

SHEDD, Circuit Judge, concurring:

I agree that summary judgment should be reversed, but for reasons different than the majority.

First, in the context of the insurance policy at issue, the term "maintain" is not ambiguous. The fact that "maintain" may have several meanings does not necessarily result in ambiguity, nor is that fact dispositive here; rather, the real question is whether, in the context of a fire insurance policy, it is reasonable to interpret "maintain" as meaning to merely have a sprinkler system in place. See Resource Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 640 (4th Cir. 2005) ("The real question, then, is whether, when read in context, a reasonable purchaser of insurance would believe that [interpretation]."). The majority concludes that it is. In my opinion, this is not a reasonable interpretation in light of the fundamental purpose of insurance, which is to allocate risk between the insurer and insured. See Autumn Ridge, L.P. v. Acordia of Virginia Ins. Agency, Inc., 613 S.E.2d 435, 438-39 (Va. 2005).

The condition in the Protective Safeguards Endorsement requiring Breton "to maintain" an automatic sprinkler system creates a duty on Breton, which is a condition precedent to coverage. As such, Breton must comply with this condition before the insurance becomes effective. In other words, in order for

24

Graphic Arts to agree to assume the risk of loss resulting from fire, this protective safeguard – a safeguard that would minimize or prevent that risk – must be in place. To read "maintain" as meaning to merely "have" a sprinkler system – regardless of whether it actually works - eliminates the purpose of that duty in allocating risk. Further, such an interpretation renders the condition completely meaningless because in this context having a non-working, non-functioning system is the factual equivalent of having no system at all (for purposes of risk allocation). See TM Delmarva Power, LLC v. NCP of Virginia, LLC, 557 S.E.2d 199, 200 (Va. 2002) ("[N]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it.").

Surely, Graphic Arts did not intend to require Breton to have a non-working sprinkler system. See Virginia Farm Bureau Mut. Ins. Co. v. Williams, 677 S.E.2d 299, 302 (Va. 2009) (noting that insurance provisions must be construed to effectuate the parties' intent). "The point is that context matters," Resource Bankshares, 407 F.3d at 642, and in this context, the requirement to "maintain" a sprinkler system is not

ambiguous – it necessarily means to have a sprinkler system which is in working order.[1]

Second, and independent of the general duty to maintain a sprinkler system as a condition to have coverage, the policy exclusion provides that Graphic Arts "will not pay for loss . . . [if Breton] [f]ailed to maintain [the sprinkler system] . . . over which [Breton] had control, in complete working order." J.A. 771. Leaving aside the lease at this point, this exclusion clearly and independently obligated Breton to keep the sprinkler system in working order to ensure there was coverage. The lease between Breton and Ragan does not change this obligation. Breton controlled the premises as lessor and cannot eliminate its obligation by merely leasing the property to a third party.[2]

---

[1] In fact, the conduct of both Breton and Graphic Arts underscores this interpretation of "maintain." In August 2007, Graphic Arts indicated to Breton's property manager that the sprinkler system needed to be inspected. J.A. 2618. In response, Breton's property manager informed Graphic Arts that the sprinkler was scheduled to be serviced later that month. Id. In addition, just weeks before the fire, Graphic Arts sent a letter reminding Breton to have the system inspected. J.A. 2017-21. Under the district court's interpretation of the duty to maintain, these warnings by Graphic Arts – as well as Breton's response – would have been unnecessary because Breton had fulfilled its duty under the policy by simply having the sprinkler system – whether it worked or not - in place.

[2] The exclusion's requirement that the system be "maintain[ed] . . . in complete working order" underscores, rather than undercuts, my reading of the general duty to (Continued)

Notwithstanding the lease relationship between Breton and Ragan, Breton controlled the sprinkler system under the policy between Breton and Graphic Arts. That Breton somehow would use its status as lessor to construct a barrier to its access to the sprinkler system is of no moment. The lease offers Breton no more excuse than if Breton had thrown away its keys to the control room for the express purpose of defeating the exclusion – Breton's obligation would still exist. An insured simply cannot take steps to defeat its obligation under the Policy and still claim coverage. See Parrish v. Wightman, 34 S.E.2d 229, 232 (Va. 1945) (noting general contract principle that if a party "is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure"). Beyond that, Breton's position that Ragan had sole control of the sprinkler system is defeated by the actual language of the lease. Under the lease, Breton had

---

"maintain" a system. Under the majority's view, the general duty (condition) is read to contrast with the exclusion because the exclusion further elaborates on "maintain." Such a reading leads to the odd but inevitable result that a non-working system is completely sufficient to satisfy the general duty. Further, notwithstanding any disagreement with the majority about what "maintain" means, the exclusion makes it clear that there will be no payment for a loss unless the system is in complete working order. Therefore, whether the focus is on the general duty or the exclusion, for Breton to recover under the policy the sprinkler system had to be in working order.

"the right to enter the Premises . . . to examine the same as well as to make any alterations and repairs . . . ." J.A. 1003. That fact underscores Breton had both physical control – as the majority interprets "control" – and legal control over the sprinkler system. Simply put, under the facts and any reading of the policy, Breton was in control of the sprinkler system and was therefore obligated to keep the system in working order.

However, aside from all of this, Graphic Arts conceded during oral argument that there is a question of what constitutes the sprinkler system being "in complete working order." In light of this concession, I would remand for a resolution of that narrow issue.